## STATE v. RAINEY

[331 N.C. 259 (1992)]

STATE OF NORTH CAROLINA v. MICHAEL LESLIE RAINEY

No. 70A89

(Filed 22 April 1992)

**Homicide § 765 (NCI4th); Criminal Law § 1310 (NCI4th) — first degree murders — felonious assaults — no error in guilt or sentencing phases**

In an appeal from three convictions of first degree murder and three convictions of assault with a deadly weapon with intent to kill inflicting serious injury wherein defendant's counsel submitted a brief in accordance with *Anders v. California,* 386 U.S. 738, in which he requested that the Supreme Court review the record to determine whether there was any error which might warrant reversal of any of defendant's convictions or modification of the sentences imposed, the Court found no error in the guilt-innocence phase of defendant's trial warranting reversal of any of defendant's convictions where the evidence of defendant's guilt was overwhelming; numerous eyewitnesses testified as to the events and circumstances surrounding the crimes charged; officers who interrogated defendant testified regarding defendant's lawfully obtained confession; defendant admitted during his own testimony that he fired several shots at the victims, injuring several of them and killing three others; and defendant's sole theory of defense at this phase of the trial that he was fearful of the victims was seriously undermined by the abundant evidence establishing that defendant initiated the shooting spree before the victims exited their cars and that defendant continued firing at the victims despite the apparent absence of any weapons held by the victims. The Court further found that the trial court committed no error in the capital sentencing proceeding or in the sentences imposed for defendant's noncapital convictions and noted that any error that might have occurred during the capital sentencing proceeding must be deemed harmless because defendant received a sentence of life imprisonment, the minimum sentence, for each of the first degree murder convictions.

**Am Jur 2d, Criminal Law §§ 807, 809; Homicide §§ 425, 559.**

**STATE v. RAINEY**

[331 N.C. 259 (1992)]

APPEAL as of right pursuant to N.C.G.S. § 7A-27 from final judgment and commitments entered by *Beaty, J.*, at the 22 August 1988 term of Superior Court, HENDERSON County, after a capital trial, imposing three consecutive life sentences upon defendant's conviction of three counts of first-degree murder. Defendant's motion to bypass the Court of Appeals pursuant to N.C.G.S. § 7A-31 was allowed by this Court on 6 November 1991 as to three additional consecutive six-year sentences imposed upon defendant for his conviction of three separate counts of assault with a deadly weapon with intent to kill inflicting serious injury. Calendared for argument in the Supreme Court 9 March 1992; determined on the briefs without oral argument pursuant to N.C. R. App. P. 30(d).

*Lacy H. Thornburg, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*Stephen P. Lindsay for defendant-appellant.*

MEYER, Justice.

On 3 April 1988, defendant, who had no prior criminal record, shot six people, three of whom died as a result of their wounds, in the parking lot of Mountain Home Baptist Church in Henderson County. Defendant was subsequently indicted on and convicted, in a capital trial, of three counts of first-degree murder and three counts of assault with a deadly weapon with intent to kill inflicting serious injury. In each of the murder cases, the jury found aggravating and mitigating circumstances, found that the mitigating circumstances were not outweighed by the aggravating circumstances, and returned a recommendation of life imprisonment. We find no error in defendant's trial or sentencing proceeding.

The evidence presented at defendant's trial tended to show the following facts and circumstances. Defendant and one of the victims, Andrea Owensby Rainey, were married in 1970. After marrying, they first lived in Atlanta for approximately nine years, returning to North Carolina in 1979. They purchased approximately nine acres of land on Sugar Loaf Mountain from Andrea's maternal grandfather, Mr. Justice, built a house on it, and moved into the house in June 1981. Andrea and her two young sons moved back to Atlanta in the summer of 1984, and she and defendant later divorced.

Defendant retained the house and land on Sugar Loaf Moun-
tain, and Andrea took possession of a house they owned in Atlanta.
Defendant's house was set back off the road, and for access, he
used an old road on the property still belonging to Andrea's grand-
father. There was no right-of-way granted to defendant, and he
used the road with Mr. Justice's permission.

During their marriage, defendant and Andrea had invested
in a riding tack store operated by Andrea's mother, Ponelle Justice
Owensby. When that business was dissolved in 1984, a conflict
arose between defendant and Ponelle. The next year, the conflict
increased when Mr. Justice died and Ponelle took over responsibili-
ty for his Sugar Loaf Mountain property. Ponelle refused to sell
defendant more land on the mountain, refused to increase the width
of the access road to defendant's house, and subsequently fenced
in the Justice property, blocking defendant's access by erecting
a gate.

Mr. Justice's widow, Andrea's grandmother, Effie Justice, died,
and the funeral was arranged for 3 April 1988 at a church within
a half mile of defendant's home. Just before the funeral service
was to take place, the Justice family members gathered before
going to the church. The group included Ponelle and her husband,
Wilford Owensby; Andrea; her two sons, Justin and Brandon;
Andrea's sister, Sheila, and her husband, Billy Johnston; and their
two young daughters, Wendy and Kimberly. All of them except
Billy Johnston, who was a pallbearer and had gone ahead of the
group, rode in two vehicles to the church. One vehicle was a Ford
automobile, driven by Andrea; with Andrea were her sister, Sheila
Johnston; Sheila's two daughters, Wendy and Kimberly Johnston;
and Andrea's seven-year-old son, Brandon Rainey. The other vehicle
was a pickup truck driven by Wilford Owensby; with him were
his wife, Ponelle, and Andrea's other son, seven-year-old Justin
Rainey. The group waited in the vehicles for a signal from the
pallbearers, who were on the church porch, to enter the church.

While sitting in her car, Andrea saw defendant go into the
church, come back out, and return to the car defendant had driven
to the church. Defendant retrieved from the car a twelve-gauge
pump shotgun, which he loaded; a .380-caliber semiautomatic hand-
gun; and ammunition for the weapons, which he put in his coat
pockets.

Defendant turned and walked in the direction of the church. When he arrived in front of the car driven by his former wife, he stopped and stood directly in front of the car, yelled at Andrea "Ah hell, f--- you," and pointed the shotgun directly at his former wife's sister, Sheila. He looked over toward Ponelle, who was seated in the truck, smiled, turned back, and pulled the trigger. The shotgun did not fire, and as Andrea was pushing Sheila onto the floor of the car, defendant began pumping the shotgun to eject the shell.

Andrea glanced up at the passenger window and saw defendant there, with the gun barrel pointed at the window, and still smiling. Defendant then shot into the vehicle with his .380-caliber pistol, hitting Andrea in her face and arm. Billy Johnston, Sheila's husband, came to the scene and said to defendant, who was still smiling, "Mike, you'll never get away. Why don't you quit." Defendant replied, "I don't intend to." Defendant then moved toward the rear passenger side window, and continued firing into the back seat of the car. When defendant had emptied his .380-caliber pistol, he laid it on top of the car.

After defendant shot into Andrea's car, he proceeded to the pickup truck parked nearby, which his former father-in-law, Wilford Owensby, had just exited to investigate the gunshots. Defendant approached Owensby, who told defendant that he was not armed. Defendant said, "Good," and immediately fired the shotgun, hitting Owensby in the chest and instantly killing him.

Andrea managed to get the car keys from her purse, start the car, and put it into reverse. Andrea drove out of the church parking lot and onto the highway. The children were screaming, and she could see bloody holes in her sister's back. Both windows on the right side of the car were blown out, and there were several bullet holes in the windshield. Andrea stopped her vehicle at a traffic light and attracted the attention of officers in a nearby police car, who called an ambulance. Nine-year-old Wendy, who was seated in the back seat, received gunshot wounds to her leg, chest, and arm.

Johnston, who had rushed toward the truck to care for Owensby, was handed a .25-caliber semiautomatic pistol by another of the pallbearers. Johnston fired at defendant but missed him. As Andrea's car left the parking lot, defendant ducked out of sight and reappeared near Johnston. Defendant pointed the shotgun at Johnston and made him throw the .25-caliber pistol on the ground. Owensby's

wife, Ponelle, then got out of the pickup truck and rushed to her husband. She looked at defendant and said, "Please," whereupon defendant shot her, killing her also.

Scott Bowles, Andrea's cousin, ducked behind Owensby's pickup truck after defendant shot Ponelle. As Bowles was crouched at the back of the truck, defendant ducked under the front of the truck and fired his shotgun under the pickup truck at Bowles, causing Bowles to fall to his knees. Johnston escaped, carrying Justin with him. Defendant then walked around the truck, picked up the .25-caliber pistol, and shot Bowles again. Bowles fell face forward on the ground, and defendant then grabbed Bowles' leg, turned him over, and shot him in the head. Defendant shot Bowles at least four times.

After defendant shot and killed Bowles, defendant kicked the bodies of Bowles, Ponelle, and Wilford. Then he laid the shotgun and keys on the hood of a hearse parked nearby, turned, and walked to his home a short distance away. From his home, defendant telephoned his girlfriend and 911. Defendant then walked to the road, where he was met by officers.

After defendant was taken into custody, he was transported to the Henderson County Sheriff's Department where he signed a waiver of counsel and acknowledgment of his *Miranda* rights. Defendant gave the interrogators a full statement concerning the events at the church.

Investigating officers found in the parking lot, near the place where Andrea's car had been parked, glass, wadding from shotguns, shells, pellets, brain tissue, pieces of skull, and blood. A witness testified that he saw defendant reload the shotgun at least three times. The officers found eight spent twelve-gauge shotgun shells, thirteen spent .380-caliber casings, as well as a number of live and spent .25-caliber shells.

Autopsies revealed that Wilford Owensby suffered shotgun wounds as well as a .25-caliber wound, Ponelle Owensby suffered numerous shotgun pellet wounds, and Scott Bowles suffered shotgun pellet wounds as well as a .25-caliber wound. The autopsy surgeon testified that Wilford Owensby, Ponelle Owensby, and Scott Bowles died as a result of multiple gunshot wounds.

Andrea suffered the loss of part of her jaw and underwent surgery. Sheila Johnston received seven bullet wounds and under-

went surgery. Wendy Johnston was hospitalized and underwent multiple surgeries.

In his own defense, defendant testified that he shot Wilford, Ponelle, and Scott because he was afraid of them and thought they had guns. Defendant stated that he did not remember retrieving his weapons from the back of the car but that he "obviously did." Defendant admitted shooting into Andrea's car as well as shooting Owensby, Ponelle, and Bowles. However, defendant could not recall the exact sequence of the events. According to defendant, he walked out of the church, passed Andrea's car, and walked to the car he had driven to the church. Defendant testified:

The first thing after that, that comes into mind was [Owensby] . . . .

I was afraid of them. And, because of [Owensby's] quality of shooting, I proceeded, when I saw [Owensby] he was behind his pick-up truck, with his left hand up against the camper top.

The right hand was folded at the small of his back. I asked [Owensby] if he had a gun. He said, "No."

And, I said, "Good."

And, then somewhere within a split second there, his right arm that was folded behind the small of his back, started folding, or at the angle of it, started getting smaller, and he started turning, and I shot him.

Defendant's appellate counsel, in accordance with *Anders v. California*, 386 U.S. 738, 18 L. Ed. 2d 493 (1967), and *State v. Kinche*, 314 N.C. 99, 331 S.E.2d 665 (1985), has submitted a brief in which he requests that the Court review the record to determine whether there is any error that might warrant reversal of any of defendant's convictions or modification of the sentences imposed.

Defendant made eighteen assignments of error covering all phases of his trial and sentencing. As to his first sixteen assignments, defendant says that prevailing case law has decided the issues against him, and he thus abandons them. The remaining two assignments of error concern the nonproduction of certain inconsistent statements of witnesses for the State. As conceded by defendant, these assignments of error were determined by our prior denial of his motion for appropriate relief. *State v. Rainey*, No. 70A89

(N.C. 9 November 1989) (unpublished). In his brief, defendant's appellate counsel states:

> Undersigned counsel has extensive experience in the practice of criminal law at both the trial and appellate levels, and has successfully prosecuted appeals on behalf of criminal appellants, which efforts have resulted in reversals of convictions or modifications of sentences. Counsel has expended in excess of 90 hours reviewing and re-reviewing the record and transcript of this trial, relating exceptions and assignments of error to existing case law, and has exhausted every conceivable source attempting to find reasonable precedent or other support for even the slightest suggestion that defendant was denied a fair trial or that his rights were prejudiced in any way. Counsel is convinced that any error that may have been committed during the course of defendant's trial was at most, harmless, and that in every incidence [sic] the trial court gave defendant the benefit of the doubt on evidentiary rulings. Consequently, counsel cannot in good faith argue that defendant was in any way denied a fair trial. The undersigned has also consulted with other experienced appellate attorneys who, after considering the facts and the result obtained at trial, are of the same opinion as regards this appeal.
>
> Because of the overwhelming evidence of defendant's guilt, coupled with his lawfully obtained confession, the primary objective of trial counsel was to save defendant from the death penalty. In this regard they were successful. Nevertheless, appellant respectfully submits the entire record to the Court for its review in the event counsel is, himself, mistaken. Counsel has fully apprised trial counsel, Mr. Ron Blanchard, and the defendant of this position, and defendant fully agrees and consents hereto.

The evidence of defendant's guilt was overwhelming. Numerous eyewitnesses testified as to the events and circumstances surrounding the crimes charged. Officers who interrogated defendant testified regarding defendant's lawfully obtained confession, relating to the jury the details of defendant's acts. In addition, defendant admitted during his own testimony that he fired several shots at the victims, injuring several victims and killing Ponelle, Owensby, and Bowles. Defendant's sole theory of defense at the guilt-innocence phase of the trial was based upon defendant's alleged fear of the victims.

**STATE v. RAINEY**

[331 N.C. 259 (1992)]

However, this defense theory was seriously undermined by the abundant evidence establishing that defendant initiated the shooting spree even before the victims had exited their cars and that defendant continued firing at the victims despite the apparent absence of any weapons held by the victims.

Both the State and defendant presented evidence at the sentencing proceeding. The State presented the testimony of four witnesses to establish that defendant appeared angry, not frightened or nervous, during the shooting incident; that defendant acted calmly after the shooting; and that defendant did not express any remorse during police interrogation. Defendant presented extensive evidence, including the testimony of twenty-one witnesses, to support twelve mitigating circumstances submitted to the jury. Based on evidence presented during the sentencing proceeding, defense counsel argued to the jury that defendant is a paranoid schizophrenic, that he shot the victims because he had "distorted disillusions [sic] that the Owensbys were out to get him," that defendant is a person of good character, and that defendant should be given a sentence of life imprisonment.

We have conducted a thorough review of the transcript of the trial and sentencing proceeding, the record on appeal, and the briefs of defendant and the State. We find no error in defendant's trial warranting reversal of any of defendant's convictions. We further find that the trial court committed no error in the capital sentencing proceeding or in the sentences imposed for defendant's noncapital convictions. Moreover, we note that any error that might have occurred during the capital sentencing proceeding must be deemed harmless beyond a reasonable doubt because defendant received life imprisonment, the minimum sentence, for each of the first-degree murder convictions.

No error.