STATE OF NORTH CAROLINA v. DAVID CLAYTON LYNCH

No. 242A93

(Filed 28 July 1995)

**1. Jury § 141 (NCI4th); Criminal Law § 1322 (NCI4th)— capital murder—jury selection—questions concerning parole**

The trial court did not err in a capital first-degree murder prosecution when it denied defendant's motion to permit *voir dire* of potential jurors regarding their conceptions about parole eligibility and in refusing to instruct the jury during trial regarding the limits of parole eligibility on a life sentence. The North Carolina Supreme Court has consistently held that jurors should

not be questioned concerning their perceptions about parole eligibility during *voir dire* and has also held that evidence about parole eligibility is not relevant in determining sentencing in a capital proceeding even if the defendant requests such an instruction or if during deliberations the jury has a question about life sentences. (For offenses occurring after 1 October 1994, the trial judge must instruct the jury that a sentence of life imprisonment means a sentence of life without parole.) N.C.G.S. § 15A-2002.

**Am Jur 2d, Trial §§ 575, 1118.**

**Procedure to be followed where jury requests information as to possibility of pardon or parole from sentence imposed. 35 ALR2d 769.**

**Prejudicial effect of statement or instruction of court as to possibility of parole or pardon. 12 ALR3d 832.**

**2. Jury § 142 (NCI4th)— capital murder—jury selection— question concerning impact of child as victim—not allowed**

The trial court did not err in a capital first-degree murder prosecution by not allowing defendant to ask potential jurors during *voir dire* whether they would automatically tend to feel that the death penalty should be imposed where the victim was a child. The question at issue here was impermissible under *State v. Robinson*, 339 N.C. 263, as an attempt to "stake out" the juror and determine what kind of verdict the juror would render under the named circumstance.

**Am Jur 2d, Jury §§ 207, 279.**

**3. Jury § 151 (NCI4th)— capital murder—jury selection— burden of proof for mitigating circumstances—questions not allowed**

The trial court did not err in a capital first-degree murder prosecution by not allowing defendant to ask a potential juror whether the defense would have to prove something in order to change personal opinions leaning toward the death penalty. The juror had not been instructed as to the legal principles at issue when the question was asked and defendant did not attempt to ask any more questions on this issue after the court had explained the law to the jurors.

**Am Jur 2d, Jury § 279.**

**4. Jury § 153 (NCI4th)— capital murder—jury selection— ability to consider mitigating circumstances—question not allowed**

The trial court did not err in a capital first-degree murder prosecution by not allowing defendant to ask potential jurors whether their feelings about the death penalty were strong enough that they would not consider mitigating circumstances, "things that are set out in the law." The phrasing of the question to imply that all mitigating circumstances were "set out in the law" was an inaccurate statement of the law, and the court allowed defense counsel to fully investigate potential jurors' views and feelings about the death penalty and ask if they would automatically vote for death and if they understood they could consider mitigating circumstances.

**Am Jur 2d, Jury § 279.**

**5. Evidence and Witnesses §§ 203, 716, 694 (NCI4th)— capital murder—evidence of defendant's mental illness excluded—no prejudicial error**

In a capital prosecution for first-degree murder, the trial court was correct in not allowing questions about family history and mental illness without a foundation establishing whether defendant's mental illness was hereditary; no prejudice resulted from disallowing a witness' testimony about defendant's background and character where the same or similar evidence was admitted through other witnesses; and no determination of whether exclusion of evidence constituted error could be made where no offer of proof was made.

**Am Jur 2d, Appellate Review §§ 705, 752-760; Evidence § 356.**

**6. Evidence and Witnesses § 203 (NCI4th)— capital murder— mental illness in defendant's family—no foundation—not admissible**

The trial court did not err in a capital first-degree murder prosecution by sustaining the prosecutor's objections to a psychiatrist's testimony in the guilt-innocence phase regarding depressive problems suffered by defendant's mother and mental illness in defendant's family where no evidence had yet been offered to establish that defendant and his mother suffered from the same mental illness or that the mental illness from which

defendant suffered was hereditary. The witness was allowed to testify in depth in the guilt-innocence phase about defendant's home life and defendant's conflict with his father and to testify during the sentencing phase that defendant suffered from Aspberger syndrome, that this syndrome would produce manic depressive illness in adult life, that manic depressive illness and Aspberger syndrome "run in families," and evidence was then admitted that other members of defendant's family suffered from depression.

**Am Jur 2d, Evidence § 338.**

7. **Evidence and Witnesses §§ 1694, 1501 (NCI4th)— capital murder—photographs of victims—bloody**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by admitting photographs of the victims at the crime scene and at the autopsy and the blood stained clothes of one of the victims. The pictures were admitted to illustrate testimony describing the position of the victims, the various injuries sustained by the victims, and the damage done to the neighborhood by defendant; the testimony was relevant and probative to the State's case against defendant; and the photographs and clothing submitted during the sentencing proceeding established the severity and brutality of the attack on one of the victims, India Anderson, and was admissible to support the especially heinous, atrocious, or cruel aggravating circumstance.

**Am Jur 2d, Evidence §§ 1451, 1070.**

**Admissibility in evidence of colored photographs. 53 ALR2d 1102.**

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

8. **Criminal Law §§ 436, 445 (NCI4th)— capital murder—prosecutor's argument—insanity defense—evasion of responsibility—return to community—no prejudice**

The trial court properly controlled the prosecutor's closing argument when the prosecutor argued that he did not think that defendant should be able to dodge or avoid or be free from responsibility by being found not guilty by reason of insanity, that a verdict of not guilty by reason of insanity is the same as a not

guilty verdict, and that the jury should find defendant guilty in order to prevent him living in the jurors' neighborhoods and committing more crimes. The court intervened *ex mero motu* and specifically instructed the jury not to take the prosecutor's personal opinions into consideration, and the jurors were also instructed to disregard statements by the prosecutor that defendant would be under no restrictions if found not guilty and that defendant might become their neighbor.

**Am Jur 2d, Criminal Law § 917; Trial § 571.**

**Prejudicial effect of argument or comment that accused, if acquitted on ground of insanity, would be released from institution to which committed. 44 ALR2d 978.**

9. **Criminal Law § 769 (NCI4th)— capital murder—insanity—instructions—no lessening of State's burden**

The trial court did not err in a capital first-degree murder prosecution in its insanity instruction where defendant contends that the instructions failed to allow the jury to consider evidence regarding defendant's insanity on the individual elements of each charge, but, read contextually and in their entirety, the instructions clearly instruct the jury to consider the evidence of defendant's diminished and impaired mental capacity in determining if defendant had the ability to formulate the specific intent which is required for conviction of first-degree murder on the basis of malice, premeditation and deliberation. The distinction in the instructions between a finding of lack of mental ability to premeditate and deliberate and insanity does not constitute error.

**Am Jur 2d, Trial §§ 1270-1278.**

10. **Criminal Law § 767 (NCI4th)— capital murder—instructions—insanity—burden of persuasion on intent**

The trial court did not err in a capital first-degree murder prosecution by instructing the jury that everyone is presumed sane and that soundness of mind is the natural and normal condition of people. Although defendant argues that the presumptions shifted to defendant the burden of persuasion on the element of intent and that cases dealing simply with the constitutionality of the insanity defense are inapplicable to this case where the jury considered diminished capacity, the cases

relied upon by defendant stand for the proposition that an expert witness may testify concerning the defendant's ability to make and carry out plans, and the jury may consider such evidence when determining if defendant had the ability to form a specific intent, and do not change the N.C. Supreme Court's analysis on the issue of the insanity instruction.

**Am Jur 2d, Trial §§ 1270-1278.**

**11. Criminal Law § 767 (NCI4th)— capital murder—insanity— instructions—burden of proof**

The trial court did not err in a capital first-degree murder prosecution by instructing the jury as to defendant's burden of proving his insanity defense in accordance with existing North Carolina law. Defendant presented no new argument persuading the Supreme Court that it should overrule its previous decisions.

**Am Jur 2d, Trial §§ 1270-1278, 1291.**

**12. Criminal Law § 1310 (NCI4th)— capital murder—sentencing—evidence of racist statements by defendant— admissible**

The trial court did not abuse its discretion in a capital first-degree murder sentencing hearing by overruling defendant's objections and refusing a mistrial after evidence was elicited during cross-examination of two of defendant's expert witnesses that defendant had stated that he wanted "to shoot at blacks and to watch them dance." The statement was not elicited to establish any type of racial bias but instead to impeach the opinions of the experts and test the value of their testimony. The statement was also relevant to show that defendant had, prior to the shooting, manifested dangerousness and a violent attitude toward a particular group of people. Although both victims and defendant were white and nothing in the record suggests the killing of either victim was a racial act, the evidence was relevant since defendant shot at a particular group of people, his neighbors.

**Am Jur 2d, Evidence §§ 326, 344.**

**13. Criminal Law § 1343 (NCI4th)— first-degree murder— aggravating circumstances—especially heinous, atrocious, or cruel—constitutional**

The especially heinous, atrocious, or cruel aggravating circumstance is constitutional. The instruction held unconstitu-

tional in *Smith v. Dixon*, 766 F. Supp. 1370, defined especially heinous, atrocious, or cruel without limiting the words which focused the jury with specificity to the nature of the circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post *Gregg* cases. 63 ALR4th 478.**

14. **Criminal Law § 1345 (NCI4th)— first-degree murder— especially heinous, atrocious, or cruel—evidence sufficient**

The trial court did not err in a capital first-degree murder prosecution by submitting the especially heinous, atrocious, or cruel aggravating circumstance to the jury where testimony demonstrates that the killing would have been "physically agonizing" to the victim and that the killing was conscienceless, pitiless, or unnecessarily torturous; defendant manifested unusual depravity of mind in this case, repeatedly and continuously shooting the victim, even as she attempted to crawl to safety; while certain testimony suggested that the first or second shot that struck India was the shot to the head and that death would have occurred soon after India was shot in the head, other evidence indicated that the victim lived for some time after being shot more than once and that in the last moments before her death, the victim was aware that she was going to die but was unable to prevent her impending death.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post *Gregg* cases. 63 ALR4th 478.**

15. **Criminal Law § 1323 (NCI4th)— first-degree murder—mitigating circumstances—instructions—weight of nonstatutory circumstances**

There was no error in a capital sentencing hearing for first-degree murder where the court's peremptory instructions for nonstatutory mitigating circumstances, which instructed the jury

that all the evidence tended to show the particular mitigating circumstance but the jury must determine if the circumstance existed and had value, were correct. Although defendant in essence argues that the jury should have been instructed to consider and give weight to uncontroverted nonstatutory mitigating circumstances, defendant demonstrated no reason why the Supreme Court should reverse or alter recent precedent.

**Am Jur 2d, Criminal Law §§ 598, 599, 628; Trial § 1441.**

16. **Criminal Law § 681 (NCI4th)— first-degree murder—mitigating circumstances—mental disturbance and impaired capacity—no peremptory instruction**

The trial court did not err in a capital sentencing hearing for first-degree murder by not giving peremptory instructions as to the statutory mitigating circumstances that the murder was committed under the influence of mental or emotional disturbance, that defendant's capacity to appreciate the criminality of his conduct was impaired, or as to the nonstatutory circumstance that defendant was generally depressed. The evidence was conflicting as to whether defendant was under the influence of a mental or emotional disturbance when he committed the murders, whether his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, and whether defendant was generally depressed.

**Am Jur 2d, Criminal Law §§ 41, 598, 599.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**Modern status of test of criminal responsibility—state cases. 9 ALR4th 526.**

17. **Criminal Law § 692 (NCI4th)— first-degree murder—instructions—not in writing**

There was no reversible error in a first-degree murder prosecution where the trial court failed to provide the jury with written instructions.

**Am Jur 2d, Trial § 1156.**

**Propriety and prejudicial effect of sending written instructions with retiring jury in criminal case. 91 ALR3d 382.**

**18. Criminal Law § 1346 (NCI4th)— first-degree murder—creating risk of death to more than one person**

The trial court did not err in a first-degree murder prosecution by overruling defendant's objections and denying his motion to preclude the use of the aggravating circumstance of creating risk of death to more than one person. N.C.G.S. § 15A-2000(e)(10).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that in committing murder, defendant created risk of death or injury to more than one person, to many persons, and the like—post-*Gregg* cases. 64 ALR4th 837.**

**19. Criminal Law § 1347 (NCI4th)— first-degree murder— aggravating circumstance—course of conduct**

The trial court did not err in a first-degree murder prosecution by overruling defendant's objection and denying his motion to preclude the use of the course of conduct aggravating circumstance. N.C.G.S. § 15A-2000(e)(11).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**20. Jury §§ 145, 103 (NCI4th)— first-degree murder—jury selection—individual voir dire—death qualification**

The trial court did not err in a first-degree murder prosecution by allowing death-qualification of the jury and by denying defendant's motion for individual *voir dire* for a portion of the jury *voir dire*.

**Am Jur 2d, Jury §§ 198,199.**

**21. Jury § 262 (NCI4th)— first-degree murder—peremptory challenges—jurors opposed to death penalty**

The trial court did not err in a first-degree murder prosecution by permitting the prosecutor to use peremptory challenges to excuse qualified jurors on account of their lack of enthusiasm for or opposition to the death penalty.

**Am Jur 2d, Jury § 234.**

**22. Criminal Law § 1334 (NCI4th)— death penalty—aggravating circumstances—pretrial notice**

The trial court did not err in a first-degree murder prosecution by failing to require the prosecution to make pretrial disclosure of the aggravating circumstances on which the State intended to rely and any evidence tending to negate or establish such factors.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**23. Criminal Law § 1351 (NCI4th)— first-degree murder—mitigating circumstances—burden of proof**

The trial court did not err in a first-degree murder prosecution by instructing the jury that defendant bore the burden of proving mitigating circumstances to the satisfaction of the jury.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**24. Criminal Law § 1323 (NCI4th)— first-degree murder—aggravating circumstances in equipoise**

The trial court did not err in a first-degree murder prosecution by giving an instruction that allowed the jury to consider the death penalty if the aggravating and mitigating circumstances were in equipoise.

**Am Jur 2d, Trial § 1120.**

**25. Constitutional Law § 371 (NCI4th)— first-degree murder—death penalty—constitutional**

The North Carolina death penalty statute is constitutional.

**Am Jur 2d, Criminal Law § 628.**

**26. Criminal Law § 1327 (NCI4th)— first-degree murder—aggravating and mitigating circumstances—instruction—duty to return death penalty**

The trial court did not err in a first-degree murder prosecution when it instructed the jury that it had a duty to return a recommendation of death if it found the aggravating circumstances, in light of the mitigating circumstances, were sufficiently substantial to call for the death penalty.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**27. Evidence and Witnesses § 1209 (NCI4th)— first-degree murder—defendant's pretrial statement—motion to suppress denied**

The trial court did not err in a first-degree murder prosecution in denying defendant's motion to suppress defendant's pretrial statement to the police.

**Am Jur 2d, Evidence § 763.**

**28. Homicide § 228 (NCI4th)— first-degree murder—motion to dismiss charges denied**

The trial court did not err in a first-degree murder prosecution in denying defendant's motion to dismiss all charges against him.

**Am Jur 2d, Homicide § 425.**

**29. Jury § 145 (NCI4th)— first-degree murder—voir dire—questions regarding mitigating circumstances**

The trial court did not err in a first-degree murder prosecution when it sustained the prosecution's objections to defense questions on *voir dire* regarding the jurors' understanding of specific mitigating circumstances and mitigating circumstances in general.

**Am Jur 2d, Jury §§ 205, 206, 264.**

**30. Jury § 217 (NCI4th)— first-degree murder—jury selection—death penalty—excusal of jurors**

The trial court did not err in a first-degree murder prosecution in excusing several jurors for cause based on their answers regarding their ability to consider capital punishment.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**31. Criminal Law § 1326 (NCI4th)— first-degree murder—sentencing—instructions—burden of proof**

The trial court did not err in a first-degree murder prosecution in failing to define for the jury the term preponderance of the evidence as that term relates to defendant's burden to prove mitigating circumstances.

**Am Jur 2d, Criminal Law § 598, 599.**

**32. Criminal Law § 1373 (NCI4th)— first-degree murder— death sentence—not disproportionate**

A death sentence in a first-degree murder prosecution was not disproportionate where the record supports the jury's finding of the aggravating circumstances upon which the court based its sentence of death; the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor; and the sentence was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

**Am Jur 2d, Criminal Law § 628.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two sentences of death entered by Sitton, J., at the 26 April 1993 Criminal Session of Superior Court, Gaston County, upon two jury verdicts of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for two counts of assault with a deadly weapon with intent to kill inflicting serious injury, one count of assault with a deadly weapon with intent to kill, five counts of assault with a deadly weapon on a law enforcement officer, six counts of assault by discharging a firearm into occupied property, and seven counts of injury to personal property was allowed 6 July 1994. Heard in the Supreme Court 13 February 1995.

*Michael F. Easley, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the State.*

*Richard B. Glazier for defendant-appellant.*

PARKER, Justice.

Defendant was tried capitally on indictments charging him with the first-degree murders of India Anderson and Bobby Dean Anderson. The jury returned verdicts finding defendant guilty of both counts of first-degree murder based on premeditation and deliberation and lying in wait as to India Anderson and on premeditation and deliberation and felony murder as to Bobby Dean Anderson. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death for each murder. The jury also found defendant guilty of two counts of assault with a deadly weapon with intent to kill inflicting serious injury, one count of assault with a deadly weapon with intent to kill, five counts

of assault with a deadly weapon on a law enforcement officer, six counts of assault by discharging a firearm into occupied property, and seven counts of injury to personal property. For these convictions the trial court sentenced defendant to an aggregate of seventy-eight and one-half years in prison. The trial court arrested judgment on defendant's conviction of two counts of injury to real property, and one count of assault by discharging a firearm into occupied property merged with the conviction for the murder of Bobby Dean Anderson. For the reasons discussed herein, we conclude the jury selection, guilt-innocence phase, and sentencing proceeding of defendant's trial were free from prejudicial error; and the death sentences are not disproportionate.

The evidence at trial tended to show the following. On 9 December 1991, from his home in Gaston County, defendant shot at his neighbors and others who came into his neighborhood for four hours. At approximately 8:00 a.m. on 9 December 1991, Tammy Anderson was taking her twelve-year-old daughter, India Anderson, and a friend's daughter, Heather Shumate, to school. Tammy and the two girls were in Tammy's car when they thought they heard the car backfire. Tammy and the girls got out of the car and heard another noise; at that point they realized someone was shooting at them. India was shot first; as Tammy ran towards India, Tammy was also shot. Tammy fell to the ground and blacked out briefly. When Tammy regained consciousness Heather was beside her, but Tammy could not see India. At this time a neighbor of the Andersons', Ronald Hunter, Sr., came running towards Tammy and Heather. Ronald Hunter, Sr. told Tammy and Heather to get down behind the car.

As Tammy, Heather, and Ronald Hunter, Sr. tried to get to safety, Ronald Hunter, Sr. was shot in the back. Ronald Hunter, Sr. was immediately shot two more times and fell to the ground. Every time Ronald Hunter, Sr. attempted to move, he was shot at again. Meanwhile, Heather and Tammy were able to get inside the Andersons' home, and Tammy called 911. While Tammy was on the phone, Tammy's husband, Bobby Anderson, walked over to and stood in front of the glass storm door. Tammy heard a shot and heard glass shatter. Bobby Anderson had been shot in the chest and was lying on the ground in front of the door. Tammy attempted to reach Bobby in order to help him but had to retreat when more shots were fired into the house. A SWAT team was eventually able to get into the Andersons' house and evacuate Tammy, Tammy's mother, and Heather. The team left Bobby Anderson, who was dead, in the house.

Around 8:00 a.m. on 9 December 1991, Ronald Hunter, Jr., a neighbor of the Andersons' and the son of Ronald Hunter, Sr., had just finished working the night shift at Freightliner and was getting ready to take a bath when he heard shooting outside. He looked out his window and saw Tammy, India, and Heather. He then saw his father running across the street to help Tammy, Heather, and India. Ronald Hunter, Jr. saw India get shot about four times as she staggered across the road. Ronald Hunter, Jr. and his mother, Tina, began yelling to India, telling her to lie down. India did lie down and she was shot several more times. Ronald Hunter, Jr. ran out to help India; but as he was dragging her back towards his house, India was shot again. Ronald Hunter, Jr. fell when India was shot, and he blacked out momentarily. When Ronald Hunter, Jr. regained consciousness, he heard shots hitting his car and heard his car alarm go off; then Ronald Hunter, Jr. was shot in the face. After he was struck in the face, Ronald Hunter, Jr. lay still pretending to be dead. Eventually Ronald Hunter, Jr. got up and made a run for the house. Ronald Hunter, Jr. left India lying on the ground; she was dead.

L.P. Bert, a member of the Gaston County Police Department, responded to calls for emergency assistance as a result of the shooting. As Bert entered the area in his patrol vehicle, he saw puffs of dirt coming his way; and his car was struck by bullets. As Bert was backing out of the area and warning other police officers of the gunfire, Detective Rick Powers drove in front of defendant's home; and his car was shot. Gaston County Police Officer W.G. Gillis, who was also at the scene, was shot in the hand and arm while trying to get a clear view of defendant. Other officers at the scene were also shot at by defendant.

Gaston County Police Sergeant James Edwards served as a crisis negotiator for the department. Edwards arrived on the scene and contacted defendant by phone. Defendant indicated to Edwards that he suffered from mental problems. Defendant also told Edwards to remove the police from the church roof by his house. Defendant then shot at the church roof, missing the officers who were on the roof, but hitting the church. Defendant informed Edwards that he had been practicing his shooting and that he was mad at his neighbors because they played loud music and had parties. After two and one-half hours on the phone with Edwards, during which time defendant continued shooting at his neighbors and the police, defendant surrendered.

Gaston County Police Detective-Sergeant J.R. Phillips took custody of defendant and transferred him to the police department for questioning. Detective D.P. Finger was in the car with Phillips and defendant. On the way to the station, defendant was asked his name and date of birth. Defendant gave his name and said he was thirty-one. Once at the station, Phillips advised defendant of his constitutional rights. Defendant indicated that he understood his rights and that he was willing to waive his rights and give a statement. In his statement defendant stated that the Andersons had harassed him since he moved into the neighborhood, that they threw wild parties, and that they would spin their tires in front of his house. Defendant also stated that he had decided to kill himself and had driven out to Seattle, Washington, and then back to the coast of North Carolina. Defendant then decided that instead of killing himself, he would kill the people who were bothering him. Defendant owned a .223-caliber Ruger ranch rifle, a Winchester .300 magnum rifle, a Springfield M1A1 .308-caliber rifle, and a Springfield .45-caliber automatic pistol. Defendant had over 1,250 rounds of ammunition for the guns. On the night of 8 December 1991, defendant barricaded himself in his home. Defendant blocked his doors with a refrigerator, stove, and washing machine; he also put plywood over windows and mattresses against the walls in his home. Defendant then waited until 8:00 a.m. to begin shooting. After defendant read and signed his confession, he stated that he knew what he had done was wrong, but "they needed to die."

Investigator Kenneth D. Ervin examined the crime scene and discovered the house was in the condition described by defendant. Ervin also noted that the windows were nailed shut.

Some of defendant's neighbors testified that while they were in their homes on the morning of 9 December 1991, bullets entered through the walls and into their bathrooms and living rooms. Bullets also struck and damaged many cars in the neighborhood.

Defendant presented evidence that he never bothered anyone in the neighborhood, that the Andersons had loud parties, and that their children ran wild. He also presented evidence that India Anderson would throw rocks at defendant and dig up people's flowers. Many of defendant's friends testified that defendant was withdrawn and depressed and that he had problems with his neighbors. These same witnesses testified that in addition to being a good friend and a good worker, defendant was good with children and was active in church activities at different times. Defendant's friends also testified that

they had recommended defendant for jobs, had set him up on dates with relatives, had let him play with their children, and had gone on trips with him.

Defendant presented expert testimony that he suffered from major depression, schizotypal personality disorder, and attention deficit disorder. Defendant would go through periods of time when he would lose contact with reality and do bizarre things such as driving across country without sleeping. Psychologist Faye Ellen Sultan testified that on 9 December 1991, defendant was unable to assess the nature and quality of his acts and did not know what he was doing was wrong. Dr. Joseph Horacek, a psychiatrist, testified that defendant suffered from auditory sensitivity, manic depression, schizotypal personality disorder, an autistic disorder, and Aspberger syndrome, an inherited neuro-developmental problem. Dr. Horacek testified that while defendant could plan the murders in a pure mechanical sense, defendant did not understand the nature and quality of his acts.

Dr. Clabe W. Lynn, the State's psychiatrist, testified that when he observed defendant, defendant was not suffering from any major psychiatric problems; but defendant was depressed and suffered from an adjustment disorder. Dr. Lynn did not reach a decision as to defendant's ability to understand right from wrong on 9 December 1991.

During the sentencing proceeding defendant presented evidence that there was a history of manic depressive illness in his family and that defendant had suffered from a mental handicap since birth which increased in severity as defendant became older. A third defense expert, Dr. Billy Williamson Royal, testified that he was in agreement with the diagnoses of Dr. Horacek and Dr. Sultan. All three experts agreed defendant could be treated for his mental illness in prison. Also at sentencing numerous witnesses testified as to defendant's good and nonviolent character, his willingness to help others, and his involvement with church activities.

Additional facts will be addressed as necessary to the understanding of a particular issue.

## JURY SELECTION

[1] Defendant argues that the trial court committed reversible error when it denied defendant's motion to permit *voir dire* of potential jurors regarding their conceptions about parole eligibility and in refusing to instruct the jury during trial regarding the limits of parole

eligibility on a life sentence. This Court has consistently held that jurors should not be questioned concerning their perceptions about parole eligibility during *voir dire*. *State v. Payne*, 337 N.C. 505, 516, 448 S.E.2d 93, 99 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 292 (1995). This Court has also held that evidence about parole eligibility is not relevant in determining sentencing in a capital proceeding even if the defendant requests such an instruction or if during delibera-tions the jury has a question about life sentences. *See State v. Skipper*, 337 N.C. 1, 43, 446 S.E.2d 252, 275 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995). This Court has previously held that the United States Supreme Court decision in *Simmons v. South Carolina*, 512 U.S. ——, 129 L. Ed. 2d 133 (1994), does not affect our prior holdings on this issue as to crimes committed prior to 1 October 1994. *State v. Conaway*, 339 N.C. 487, 520, 453 S.E.2d 824, 845 (1995). After that date by statutory amendment, North Carolina has life with-out parole. N.C.G.S. § 15A-1380.5 (Supp. 1994). For offenses occur-ring after 1 October 1994, the trial judge must instruct the jury that a sentence of life imprisonment means a sentence of life without parole. N.C.G.S. § 15A-2002 (Supp. 1994). Defendant has failed to assert a convincing basis for this Court to abandon its prior decisions holding that instructions on parole eligibility should not be given and that jurors should not be questioned regarding their perceptions about parole eligibility. This assignment of error is overruled.

[2] Defendant argues that the trial court committed reversible error when it disallowed three particular questions during *voir dire*. The questions at issue were as follows:

1. How about in a case where a child is killed? Would you auto-matically tend to feel that the death penalty should be imposed?

2. [W]ould you require the defense to prove something to you in order to change your personal opinions about leaning toward the death penalty?

3. In other words, would any of you feel that your feelings about the death penalty were strong enough so that you would not con-sider the mitigating circumstances presented by the defense, things that are set out in the law that you can consider and should consider? Would you be able to do that or would your mind be such that you would be unable to do that?

Defendant argues that these questions were proper under *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992), because they inquired

STATE v. LYNCH

[340 N.C. 435 (1995)]

into whether a juror could be fair and impartial in a capital case and whether predetermined views regarding the death penalty would substantially impair a juror's ability to serve on the jury. We conclude that *Morgan v. Illinois* does not require that a defendant be allowed to ask the questions at issue in this case.

In *State v. Robinson*, 339 N.C. 263, 451 S.E.2d 196, (1994), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 818 (1995), this Court held that it was not proper to ask potential jurors if they would impose the death penalty under the particular facts and circumstances of the case. *Id.* at 273, 451 S.E.2d at 202. In *Robinson* defendant had attempted to ask jurors if they would be able to follow the judge's instructions and weigh the aggravating and mitigating circumstance even though the defendant had killed three people, including a small child, and had a previous conviction for first-degree murder. *Id.* at 272, 451 S.E.2d at 202. This Court held that the trial court did not err by not allowing the question because the question was "an improper attempt to 'stake out' the jurors as to their answers to legal questions before they are informed of legal principles applicable to their sentencing recommendation." *Id.* at 273, 451 S.E.2d at 202. This Court also noted that " '[c]ounsel should not fish for answers to legal questions before the judge has instructed the juror on applicable legal principles by which the juror should be guided . . . . Jurors should not be asked what kind of verdict they would render under certain named circumstances.' " *Id.* (quoting *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980)).

We conclude that the first question at issue here, whether the juror would "automatically tend to feel that the death penalty should be imposed" when a child had been killed, was impermissible since the question was an attempt to "stake out" the juror and determine what kind of verdict the juror would render under the named circumstance.

[3] Regarding the other two questions, a review of the *voir dire* reveals that the trial court did not allow the questions to be asked because the questions as phrased did not correctly state the law.

As to the second question, defense counsel asked prospective juror Willis:

Let me ask if the percentage would be such that you would be leaning toward the death penalty, would it—would you require the defense to prove something to you in order to change your personal opinions about leaning toward the death penalty?

The trial court did not allow Willis to answer, stating:

Sustained.

   And, members of the jury, I will explain to you that mitigating circumstances are required to be proven by a preponderance to a juror or by a preponderance is the standard. The State has beyond a reasonable doubt as to aggravating factors. But the defendant does have to prove mitigating circumstances by a preponderance. Would you be able to follow the law in each respect?

Prospective juror Willis responded, "Yes." Willis had already stated that she could consider both death and life imprisonment as a sentence. The concept of aggravating and mitigating circumstances had previously been explained to juror Willis, and she had said she could consider the evidence presented.

In *State v. Phillips*, 300 N.C. at 681-82, 268 S.E.2d at 455, this Court held that the trial court did not err by refusing to permit defendant to ask a prospective juror whether the defendant would have to prove anything to the juror in order to be entitled to a verdict of not guilty. The Court held the question was an attempt to "fish for answers to legal questions before the judge has instructed the juror on applicable legal principles by which the juror should be guided." *Id.* at 682, 268 S.E.2d at 455. We conclude that the question at issue here was also impermissible as the juror had not been instructed as to the legal principles at issue when the question was asked. After the question was asked, the trial court explained that the defendant and the State had different burdens in regard to proving mitigating and aggravating circumstances. Defendant did not attempt to ask any more questions on this issue after the court had explained the law to the jurors.

[4] In the next question at issue defendant attempted to ask a different group of prospective jurors:

   In other words, would any of you feel that your feelings about the death penalty were strong enough so that you would not consider the mitigating circumstances presented by the defense, things that are set out in the law that you can consider and should consider? Would you be able to do that or would your mind be such that you would be unable to do that?

The Court again did not allow an answer to be given, stating:

> Well, the Court will sustain that. Not necessarily set out. Things they find to be and they deem to be mitigating. Do you understand that you can—may find mitigating circumstances as an individual juror? Do you understand that?

The three jurors being questioned responded that they did understand. These jurors had already stated that they would not "automatically tend to favor the death penalty" if defendant was found guilty. Defendant again did not attempt to follow up with additional questions.

The phrasing of the question to imply that all mitigating circumstances were "set out in the law" was an inaccurate statement of the law. Only statutory mitigating circumstances are actually set out and, if found, must be considered to have value. Nonstatutory mitigating circumstances are not specifically set out and do not necessarily have to have mitigating value. *State v. Basden*, 339 N.C. 288, 304, 451 S.E.2d 238, 247 (1994), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 845 (1995).

Defendant relies on *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492, to support his argument that he should have been allowed to ask all three questions. In *Morgan* the United States Supreme Court held that a defendant must be allowed, through the use of jury *voir dire*, an opportunity "to lay bare the foundation of [his] challenge for cause against those prospective jurors who would *always* impose death following conviction." *Id.* at 733, 119 L. Ed. 2d at 506. The Court went on to hold that a defendant is "entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case-in-chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." *Id.* at 736, 119 L. Ed. 2d at 507.

In *Morgan v. Illinois* the defendant was not allowed to ask if a juror would "automatically vote to impose the death penalty no matter what the facts are." *Id.* at 723, 119 L. Ed. 2d at 499. The questions at issue here bear little resemblance to the question at issue in *Morgan*. This Court has held that

> *Morgan* stands for the principle that a defendant in a capital trial must be allowed to make inquiry as to whether a particular juror would automatically vote for the death penalty. "Within this broad principle, however, the trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled; its rul-

ings in this regard will not be reversed absent a showing of abuse of discretion." *State v. Yelverton*, 334 N.C. 532, 541, 434 S.E.2d 183, 188 (1993).

*State v. Robinson*, 336 N.C. 78, 102-03, 443 S.E.2d 306, 317 (1994), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 650 (1995).

In this case the trial court did allow defense counsel to fully investigate potential jurors' views and feelings about the death penalty and ask if they would automatically vote for death and if they understood they could consider mitigating circumstances. The court itself explained the different burdens of proof that defendant and the State must meet when submitting aggravating and mitigating circumstance for consideration by the jury. Defendant having been "afforded a fair opportunity to make the inquiries specifically authorized in *Morgan*," *Robinson*, 336 N.C. at 103, 443 S.E.2d at 317, we conclude that the trial court did not abuse its discretion by not allowing defendant to ask these three particular questions. Defendant's assignment of error on these grounds is overruled.

GUILT-INNOCENCE PHASE

**[5]** Defendant argues that the trial court erred when it improperly sustained repeated prosecutorial objections to lay witnesses' testimony concerning defendant's home life; mental illness in defendant's family; defendant's physical appearance on occasion; and statements by defendant to his friends as to his mental state, mental health, and emotional status including comments about suicide. A review of the transcript reveals, however, that: (i) most of the evidence which may not have been admitted through the testimony of one particular witness was admitted through the testimony of other witnesses; (ii) the objections were correctly sustained because defendant had not laid a proper foundation; or (iii) there was no offer of proof after an objection was sustained, and the question has not been properly preserved for appellate review.

Defendant sets forth over thirty questions that he contends the trial court should have allowed the witnesses to answer. Defendant begins by noting that "[e]vidence is relevant if it has any logical tendency to prove a fact in issue," *State v. Goodson*, 313 N.C. 318, 320, 327 S.E.2d 868, 869 (1985), and that the relevancy standard is relatively lax and particularly easy to satisfy in a criminal case, *State v. McElrath*, 322 N.C. 1, 13, 366 S.E.2d 442, 449 (1988). Defendant then argues that excluding relevant evidence is a violation of defendant's

right to present evidence in his defense, which right is guaranteed by the Sixth Amendment. Defendant also argues that the exclusion of relevant evidence violates defendant's right to due process, which "is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 35 L. Ed. 2d 297, 308 (1973). Defendant argues that in this case the trial court allowed various defense witnesses to take the stand, but in an arbitrary fashion the trial court excluded material portions of the witnesses' testimony. This exclusion of relevant evidence elicited from numerous witnesses prevented him from offering material evidence in support of his insanity and diminished-capacity defenses, thereby implicating defendant's federal and state constitutional rights and reducing defendant's ability to defend himself against the two charges of first-degree murder.

Asserting that many mental illnesses are hereditary, defendant argues that the witnesses should have been able to testify concerning defendant's dysfunctional family. However, defendant did not establish that his particular mental illnesses were hereditary before asking questions about the history of mental illness in his family. In *State v. Wade*, 296 N.C. 454, 251 S.E.2d 407 (1979), the Court noted:

> While it is true that evidence of hereditary insanity has been held admissible, there was not an adequate foundation for its admission here. In order for insanity among a person's ancestors or relatives to be relevant, it must first be shown that (1) there is independent evidence of insanity on the part of the person, (2) the same type of mental disorder is involved, and (3) the mental disorder is hereditary in character.

*Id.* at 464, 251 S.E.2d at 413 (citations omitted). In this case, as in *Wade*, at the time the witness testified, no evidence had been presented that the mental disorders from which defendant suffered were hereditary in character. Thus, the questions about mental illness within defendant's family were properly excluded.

Next, defendant argues that the witnesses should have been allowed to testify concerning turmoil in defendant's life to explain why defendant could not conform his conduct to the dictates of society. Defendant argues that facts about defendant's lifestyle, actions, appearance, and conversation with friends and family should have been presented to the jury so it could understand the experts' and lay witnesses' opinions. However, evidence similar to that defendant sought to elicit from lay witnesses was, in fact, presented to the jury

at some point during the guilt-innocence phase. Witnesses were allowed to testify that defendant was depressed; that the inside of his home was disorderly; that he had trouble interacting with members of the opposite sex; that he had strong opinions condemning smoking, drinking, and sex; that he was strange and weird; that he was shy and withdrawn; that he had had suicidal thoughts, had been to a mental ward months before this incident, and had been prescribed Prozac but stopped taking it; that he had problems with his neighbors; and that his neighbors made him agitated. Thus, defendant was not prejudiced by the trial court's disallowing repetitious evidence about different aspects of defendant's life, as the evidence was admitted through other witnesses. *See State v. Pridgen,* 313 N.C. 80, 87, 326 S.E.2d 618, 623 (1985) (holding it was not error not to admit evidence at one point as the same evidence was elicited at other times); *State v. Walden,* 311 N.C. 667, 673, 319 S.E.2d 577, 581 (1984) (holding defendant cannot show prejudice from exclusion of evidence at one point where same or similar evidence later admitted through different witness).

The trial court also did not allow certain witnesses to relate statements, defendant made to the witness prior to the alleged crime. "[S]tatements by an accused of an existing emotion or other mental state made before the commission of the crime and not shown to be in contemplation of the commission of the crime are admissible as bearing upon the mental capacity of the accused at the time the crime was committed." *State v. Linville,* 300 N.C. 135, 137, 265 S.E.2d 150, 152 (1980). However, defendant in this case failed to make an offer of proof, and this Court cannot determine whether defendant's statements related to his existing emotional or mental state. " '[I]n order for a party to preserve for appellate review the exclusion of evidence, the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required unless the significance of the evidence is obvious from the record.' " *State v. Hill,* 331 N.C. 387, 410, 417 S.E.2d 765, 776 (1992) (quoting *State v. Simpson,* 314 N.C. 359, 370, 334 S.E.2d 53, 60 (1985)), *cert. denied,* —— U.S. ——, 122 L. Ed. 2d 684, *reh'g denied,* —— U.S. ——, 123 L. Ed. 2d 503 (1993); *see also State v. Walden,* 311 N.C. at 673, 319 S.E.2d at 581 (holding where defendant fails to include in record the answer to an objected-to question, he has failed to show prejudice).

Defendant argued in oral argument that no offer of proof was necessary since answers to the questions to which an objection was sustained were presented in the sentencing proceeding. Defendant is

STATE v. LYNCH　.

[340 N.C. 435 (1995)]

correct that evidence pertaining to the history of mental illness in defendant's family was elicited during the sentencing proceeding, but as to certain other questions asked in the guilt-innocence phase, nothing in the record indicates what the answers would have revealed. In these instances this Court cannot determine if the evidence would have been relevant to defendant's mental capacity at the time the crime was committed. *See State v. Wade*, 296 N.C. at 464, 251 S.E.2d at 413 (holding that Court cannot tell if exclusion of declarations by defendant to witness was prejudicial without the potential answers).

To establish prejudice based on evidentiary rulings, defendant bears the burden of showing that a reasonable possibility exists that, absent the error, a different result would have been reached. N.C.G.S. § 15A-1443(a) (1988); *see State v. Weeks*, 322 N.C. 152, 170, 367 S.E.2d 895, 906 (1988). After carefully reviewing the questions and answers to which the prosecution objected, we conclude the trial court did not err; and, moreover, any error that did occur during the questioning of defendant's witnesses was harmless. The trial court was correct in not allowing the questions about family history and mental illness without a foundation establishing whether defendant's mental illness was hereditary. Where the same or similar evidence was admitted through other witnesses, no prejudice resulted from disallowing a witness' testimony about defendant's background and character. Finally, in those circumstances where no offer of proof was made, we cannot determine if exclusion of the evidence constituted error. Defendant's assignment of error is overruled.

**[6]** In a related issue defendant argues that the trial court committed reversible error during the guilt-innocence phase by sustaining the prosecution's objections to testimony by Dr. Horacek regarding mental illness in defendant's family.

Specifically, the trial court struck the witness' testimony that "[i]n the past few years she [defendant's mother] has had some major depressive problems and memory problems." Horacek also was not allowed to answer defendant's question, "Did you learn from your investigation with regard to the family of David Lynch as to whether or not there was any mental illness in the family?" Defendant argues that this testimony should not have been excluded because Horacek had stated that the family history had been part of the basis for his opinion.

A review of Dr. Horacek's testimony in the guilt-innocence phase reveals that Horacek was allowed to testify in depth about defend-

ant's home life with his family. Additionally, Horacek testified concerning defendant's conflict with his father and defendant's tendency to run away or disappear for periods of time, a habit which began when he was young and continued into defendant's adult life. The trial court correctly ruled, however, that the witness could not testify that defendant's mother was depressed because no evidence had yet been offered to establish that defendant and his mother suffered from the same mental illness or that the mental illness from which defendant suffered was in fact hereditary. *See State v. Wade*, 296 N.C. at 464, 251 S.E.2d at 413.

During the sentencing phase Dr. Horacek testified that defendant suffered from Aspberger syndrome; that this syndrome would produce manic depressive illness in adult life; and that manic depressive illness and Aspberger syndrome "run in families." After Dr. Horacek had testified that defendant's illnesses "run in families," evidence that other members of defendant's family suffered from depression was admitted. Thus, once defendant had established that defendant suffered from a particular mental illness and that the illness was hereditary, then evidence that other family members suffered from the same illness was correctly admitted by the trial court. Defendant not having set forth the proper foundation for admitting such evidence during the guilt-innocence phase, the trial court correctly determined such evidence was inadmissible at that time. Defendant's argument is without merit.

[7]    Defendant further contends that the trial court committed reversible error in denying defendant's motion to exclude or substantially limit the number of photographs, X rays, and diagrams of the victims' bodies at the scene of the crime and at the autopsy. Prior to trial defendant moved to exclude all irrelevant photographs and all photographs whose probative value was outweighed by the danger of unfair prejudice. The trial court reserved ruling on defendant's motion until the State moved to introduce the photographs. In his brief before this Court, defendant makes no argument concerning X rays or diagrams.

Defendant specifically argues that six crime-scene photographs of the victims as well as eight autopsy photographs of the victims were gory and graphic and were unnecessarily introduced during the guilt-innocence phase of the trial since the medical examiners who had performed the autopsy had already testified in detail about the victims' injuries. Defendant also argues that the trial court erred by

STATE v. LYNCH

[340 N.C. 435 (1995)]

allowing the State to introduce a number of crime-scene photographs and the bloody clothes of India Anderson at the sentencing proceeding. Defendant contends that the photographs and clothes were unrelated to any issue before the jury at the sentencing proceeding and that the sole purpose for the introduction of the photographs and bloody clothing was to sway the jury through sympathy for the deceased and anger at defendant.

Defendant relies on *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988), in arguing that the admission of the photographs was prejudicial error. In *Hennis* this Court held that

[p]hotographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury.

*Id.* at 284, 372 S.E.2d at 526.

The Court noted further in *Hennis* that

there is no bright line indicating at what point the number of crime scene or autopsy photographs becomes too great. The trial court's task is rather to examine both the content and the manner in which photographic evidence is used and to scrutinize the totality of circumstances composing that presentation.

*Id.* at 285, 372 S.E.2d at 527.

"In a homicide case, photographs depicting the location and condition of the body at the time it was found are competent despite their portrayal of gruesome events which a witness testifies they accurately portray." *State v. Alford*, 339 N.C. 562, 577, 453 S.E.2d 512, 520 (1995). Additionally, photographs taken during an autopsy are generally deemed admissible, and "[i]n a first-degree murder case, autopsy photographs are relevant even when such factors as the identity of the victim or the cause of death are not disputed." *State v. Skipper*, 337 N.C. at 35, 446 S.E.2d at 270.

Based on our review of the autopsy and crime-scene photographs and the manner in which they were presented to the jury, we conclude that the trial court did not abuse its discretion in allowing the admission of the photographs. The eight autopsy photographs were of the multiple wounds of the two victims photographed from different angles. The multiple crime-scene photographs illustrated the posi-

tions of the victims India Anderson, Bobby Anderson, and Ronald Hunter, Sr., as well as the damage done to defendant's neighbors' homes and cars. The photographs admitted during the sentencing proceeding were also from the crime scene and showed the wounds inflicted upon India Anderson. When the clothes were shown to the jury, the witness described the holes in the clothes and the blood on the clothes, illustrating the severity of the attack on India Anderson.

After reviewing the photographs and the manner in which they were presented, we are of the opinion that the pictures were not unfairly prejudicial or unduly repetitive. The pictures were admitted to illustrate testimony describing the position of the victims, the various injuries sustained by the victims, and the damage done to the neighborhood by defendant. The testimony was relevant and probative to the State's case against defendant. The photographs and clothing submitted during the sentencing proceeding established the severity and brutality of the attack on India. This evidence was admissible to support the especially heinous, atrocious, or cruel aggravating circumstance. We conclude the trial court did not abuse its discretion in admitting the evidence at issue. Defendant's assignment of error is overruled.

**[8]** Defendant next argues that he should be granted a new trial because the trial court erred in not intervening *ex mero motu* when the prosecutor made inflammatory and prejudicial remarks to the jury in closing argument. Defendant argues that on four occasions, the prosecutor erred by urging the jury not to allow defendant to be free from responsibility or to avoid responsibility by finding defendant not guilty by reason of insanity. At one point the prosecutor argued that he did not think defendant should "be able to dodge" or "avoid" or be "free from responsibility." In response to this argument, the trial court intervened *ex mero motu* and instructed the jury as follows:

Members of the jury, just a moment ago the district attorney indicated what he thought or he said, "but I think," . . . but you are not to take his opinions in consideration. The Court will allow you to take what he said as a contention on behalf of the state, but do not take any statement to you as a personal opinion. That is improper.

Defendant also argues that the following argument was erroneous:

**STATE v. LYNCH**

[340 N.C. 435 (1995)]

Ladies and gentlemen, the last point I am going to make. Think about this. Are you satisfied that he was insane on December 9, 1991. The state submits to you that you are not. If you are even thinking about it, remember this. Not guilty by reason of insanity is not guilty. Oh, it has a little bit more wording there but the effect is not guilty. When you say not guilty you are saying no crime was committed. You are saying David Lynch—

MR. WILLIAMS: (Interrupting)—OBJECTION to that argument.

THE COURT: OVERRULED.

MR. LANDS: You are saying David Lynch didn't kill and assault. Are you satisfied? When you say not guilty that means there are no restrictions on Mr. Lynch.

MR. CALDWELL: OBJECTION.

THE COURT: SUSTAINED. Well, OVERRULED as to that statement.

MR. LANDS: No restrictions. Perhaps some day he becomes your neighbor—

MR. CALDWELL: (Interrupting)—OBJECTION.

THE COURT: SUSTAINED. Stay within the bounds of argument.

MR. CALDWELL: Ask the Court to instruct the jury to disregard the last statement.

THE COURT: ALLOWED. Members of the jury, do not take the last statement of the district attorney in consideration in your jury deliberations.

Defendant argues that the suggestion that a verdict of not guilty by reason of insanity is the same as a verdict of not guilty was erroneous because it misstated the law. Defendant also argues that the statement urging the jury to find defendant guilty in order to prevent him from living in the jurors' neighborhoods and committing more crimes was intended to inflame the jurors and appeal to their emotions. Defendant concedes that the trial court properly sustained objections in both cases and instructed the jurors not to consider the latter argument but argues that the statements could not have been disregarded by the jury and, thus, fatally infected defendant's trial. We disagree.

**STATE v. LYNCH**

[340 N.C. 435 (1995)]

The control of the arguments of counsel must be left largely to the discretion of the trial judge, and the appellate courts ordinarily will not review the exercise of the trial judge's discretion in this regard unless the impropriety of counsel's remarks is extreme and is clearly calculated to prejudice the jury in its deliberations.

*State v. Johnson*, 298 N.C. 355, 368-69, 259 S.E.2d 752, 761 (1979) (citations omitted). Where a jury has been specifically instructed by the trial court not to take certain statements made by the prosecutor into consideration, "[w]e must assume the jury heeded the instructions and did not consider the arguments to the defendant's prejudice." *State v. Erlewine*, 328 N.C. 626, 632, 403 S.E.2d 280, 283 (1991).

We conclude that in this case the trial court properly controlled the prosecutor's closing argument so as to avoid any prejudicial error to defendant. During the prosecutor's closing arguments the trial court intervened *ex mero motu* and specifically instructed the jury not to take the prosecutor's personal opinions into consideration. The jurors were also instructed to disregard statements by the prosecutor that defendant would be under no restrictions if found not guilty and that defendant might become their neighbor. Based on our careful review of the prosecutor's closing argument and the instructions given by the trial court during the closing argument, defendant's assignment of error is overruled.

## JURY INSTRUCTIONS

[9] Defendant makes three arguments regarding the insanity instruction. First, defendant argues that the jury instruction for insanity unconstitutionally relieved the State of its burden of proof by forbidding the jury to consider the affirmative defense of insanity on any element unless the jury first convicted defendant of murder. Defendant contends that the trial court's instructions failed to allow the jury to consider evidence regarding defendant's insanity on the individual elements of each charge because in the instructions to the jury, the court stated:

When there is evidence which tends to show that the defendant was legally insane at the time of the alleged offense, you will consider this evidence only if you find that the state has proved beyond a reasonable doubt each of the things about which I have already instructed you in regard to the two concepts.

Under these instructions, according to defendant, the jury "could not consider the substantial evidence of the defendant's diminished, impaired mental capacity and mental illness on the issues of premeditation, deliberation, specific intent to kill or malice." Defendant argues that the jury should have been allowed to consider such evidence because the defendant may fail to carry his burden of insanity and still present sufficient evidence to create a reasonable doubt as to the elements of first-degree murder.

Defendant fails to note that after the trial court instructed the jury on the elements of intent to kill and premeditation and deliberation, the trial court instructed on the concept of lack of mental capacity as follows:

> You may find there is evidence which tends to show that the defendant lacked mental capacity at the time of the acts alleged in this case. If you find that the defendant lacked mental capacity, you should consider whether this condition affected his ability to formulate the specific intent which is required for conviction of first-degree murder on the basis of malice, premeditation and deliberation.
>
> In order for you to find the defendant guilty of first-degree murder under this theory, that is, upon the basis of malice, premeditation and deliberation; you must find beyond a reasonable doubt that he killed the deceased with malice and in the execution of an actual specific intent to kill formed after premeditation and deliberation. If, as a result of lack of mental capacity, the defendant did not have the specific intent to kill the deceased formed after premeditation and deliberation, he is not guilty of first-degree murder under this theory.
>
> Therefore I charge that if, upon considering the evidence with respect to the defendant's lack of mental capacity, you have a reasonable doubt as to whether the defendant formulated the specific intent required for conviction of first-degree murder under this theory, you will not return a verdict of first-degree murder on the basis of malice, premeditation and deliberation.

"One of the cardinal rules governing appellate review of trial court instructions is that the charge will be read contextually and an excerpt will not be held prejudicial if a reading of the whole charge leaves no reasonable grounds to believe that the jury was misled." *State v. Alston*, 294 N.C. 577, 594, 243 S.E.2d 354, 365 (1978); *see also*

*State v. Davis*, 321 N.C. 52, 59, 361 S.E.2d 724, 728 (1987) (holding that "[i]n reviewing jury instructions for error, this Court has held that they must be considered in their entirety"). Read contextually and in their entirety, the jury instructions clearly instruct the jury to consider the evidence of defendant's diminished and impaired mental capacity in determining if defendant had the ability to formulate the "specific intent which is required for conviction of first-degree murder on the basis of malice, premeditation and deliberation."

While the instructions do distinguish between a finding of lack of mental ability to premeditate and deliberate and insanity, this distinction does not constitute error. This Court has held that "[t]he ability to distinguish between right and wrong and the ability to premeditate and deliberate are entirely different considerations." *State v. Ingle*, 336 N.C. 617, 629, 445 S.E.2d 880, 886 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 222 (1995). "It requires less mental ability to form a purpose to do an act [to premeditate and deliberate] than to determine its moral quality." *State v. Cooper*, 286 N.C. 549, 573, 213 S.E.2d 305, 321 (1975). Thus, the trial court did not err when it instructed the jury to consider the issue of defendant's sanity only after it had considered defendant's mental ability to formulate the specific intent to kill as these are two different concepts.

Reviewing the jury instructions in their entirety, we conclude that the trial court did not err in instructing the jury to consider the evidence of insanity after it determined that the State had proven beyond a reasonable doubt all the elements of murder. The trial court had previously instructed that when considering the elements of specific intent—premeditation and deliberation—the jury should consider defendant's potential lack of mental capacity. While the jurors were instructed not to reach a decision on defendant's sanity until they had considered all the elements of the crime, they were never barred from considering evidence of defendant's mental capacity when determining whether the State had proven the elements of the crime beyond a reasonable doubt. Defendant's assignment of error is overruled.

[10]   Second, defendant argues that the trial court committed reversible error in instructing the jury that "everyone is presumed sane" and that "soundness of mind is the natural and normal condition of people." According to defendant these presumptions deprived him of his Fourteenth Amendment right to due process of law and are contrary to *Francis v. Franklin*, 471 U.S. 307, 85 L. Ed. 2d 344 (1985),

and *Sandstrom v. Montana*, 442 U.S. 510, 61 L. Ed. 2d 39 (1979). Specifically, defendant argues that the presumptions shifted to defendant the burden of persuasion on the element of intent, for if a person is presumed to be of a sound mind, he obviously is considered to intend the consequences of his acts. In *Sandstrom* the erroneous instruction reads "the law presumes that a person intends the ordinary consequences of his voluntary acts." *Sandstrom*, 442 U.S. at 512, 61 L. Ed. 2d at 43. In *Franklin* the instructions at issue read: "The acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted," and a "person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted." *Franklin*, 471 U.S. at 311, 85 L. Ed. 2d at 351. In both these cases the instructions included phrases not present in the instructions at issue in this case. Specifically, the instructions in *Franklin* and *Sandstrom* instructed the jury that a person of a sound mind is presumed to intend the consequences of his act. Such instructions created a presumption that the defendant acted with specific intent and shifted the burden of proving this essential element to the defendant, who then had to prove he did not act with specific intent.

In *State v. Mize*, 315 N.C. 285, 293, 337 S.E.2d 562, 567 (1985), the defendant argued that by placing the burden of proof on the issue of insanity on defendant, the State is relieved of its duty to establish that the act was committed with the requisite *mens rea*. This Court held that "[t]he *mens rea* or the criminal intent required for first degree murder is proven through the elements of premeditation and deliberation" and "that the State is not unconstitutionally relieved of any burden by the rule placing the burden of proof on the issue of insanity on defendant." *Id.* at 293-94, 337 S.E.2d at 567. In *State v. Thompson*, 328 N.C. 477, 484-85, 402 S.E.2d 386, 389-90 (1991), the defendant also argued that the State was relieved of proving essential elements of the crime because the burden of proving insanity is placed on the defendant. The defendant argued that the instruction was in violation of the holding in *Franklin*, 471 U.S. 307, 85 L. Ed. 2d 344, and *Sandstrom*, 442 U.S. 510, 61 L. Ed. 2d 39. This Court rejected defendant's argument. *Thompson*, 328 N.C. at 485, 402 S.E.2d at 390.

In the present case defendant argues that prior to *State v. Clark*, 324 N.C. 146, 377 S.E.2d 54 (1989); *State v. Rose*, 323 N.C. 455, 373 S.E.2d 426 (1988); and *State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988), this Court did not recognize the existence of a diminished capacity or mental illness defense negating specific intent. Thus,

defendant argues that prior to these three cases, evidence of mental illness could not be considered by the jury as to any other issue in the case once a defendant was determined to be sane. After *Clark, Rose,* and *Shank,* the jury was allowed to consider the evidence of mental illness as it relates to issues of premeditation and deliberation and would consider the presumption of sanity instruction when considering the lack of mental capacity instruction for purposes of premeditation and deliberation. Thus, defendant argues cases dealing simply with the constitutionality of the insanity instruction are inapplicable to this case where the jury considered diminished capacity.

Our review of *Clark, Rose,* and *Shank* discloses that these cases stand for the proposition that an expert witness may testify concerning the defendant's ability to make and carry out plans, and the jury may consider such evidence when determining if defendant had the ability to form a specific intent. *Clark,* 324 N.C. at 159-60, 377 S.E.2d at 62; *Rose,* 323 N.C. at 458, 373 S.E.2d at 428; *Shank,* 322 N.C. at 248, 367 S.E.2d at 643. We conclude that *Clark, Rose,* and *Shank* do not change this Court's analysis on the issue of the insanity instruction, and we decline to disturb our cases holding that the State has not been relieved of its burden to prove specific intent by requiring defendant to prove that he was insane. Defendant's assignment of error is overruled.

[11] Finally, defendant argues that the trial court committed reversible error by placing on defendant the burden of proof on the issue of insanity in violation of his right to have the prosecution prove every element of the crime beyond a reasonable doubt. This argument is similar to the argument above. Defendant argues that the insanity "instruction violates due process by shifting the burden of proof on the *mens rea* element of first degree murder as well as the scienter elements of all the specific intent felonies with which defendant was charged."

The trial court instructed the jury as to defendant's burden of proving his insanity defense in accordance with existing North Carolina law. As defendant concedes in his brief this Court has previously considered and rejected defendant's arguments. In *State v. Thompson,* 328 N.C. at 485, 402 S.E.2d at 390, the defendant argued that placing on the defendant the burden of proof on the issue of insanity violates due process by shifting the burden of proof on the *mens rea* element of first-degree murder as well as the scienter elements of burglary and robbery with a dangerous weapon. In

STATE v. LYNCH

[340 N.C. 435 (1995)]

*Thompson,* 328 N.C. 477, 402 S.E.2d 386, this Court noted that such arguments have been rejected in *State v. Evangelista,* 319 N.C. 152, 353 S.E.2d 375 (1987), and *State v. Mize,* 315 N.C. 285, 337 S.E.2d 562, and declined to overrule these cases. This defendant has presented no new argument persuading this Court that it should overrule its previous decisions. Defendant's assignment of error is without merit.

SENTENCING PROCEEDING

[12] Defendant argues that the trial court committed reversible error when it overruled defendant's objections to evidence the defendant stated he wanted "to shoot at blacks and to watch them dance." This evidence was elicited during cross-examination of two of defendant's expert witnesses at the sentencing proceeding. Defendant argues that the introduction of this evidence was erroneous because it was without probative value, did not negate any mitigating circumstance tendered by defendant, did not relate to any aggravating circumstance in the case, and prejudiced defendant.

The State, during its cross-examination of Dr. Horacek, asked Horacek if he had reviewed statements made by Wes Hodnett when forming his opinion about defendant. Horacek said he had considered such statements. The State asked Horacek if it were not true that Wes Hodnett had said that defendant told Hodnett that "he [defendant] wanted to shoot at blacks and to watch them dance." Dr. Horacek responded that he did not recall reading that statement and could not find the statement in his file. The State did not ask Horacek any more questions about this specific statement. On cross-examination of Dr. Royal, another of defendant's experts, the State asked: "Is it not true in there that Wes Hodnett made a statement that David [defendant] talked about shooting at blacks at their feet?" Dr. Royal stated, over objection, that in his file he had written:

He stated on one occasion he was talking in front of his sister about shooting at a group of blacks and making them dance around while he was shooting at their feet. He stated that his sister got on to him about this and he went on and smiled and said he was kidding.

Defendant moved to strike this testimony and moved for a mistrial. Defendant argues this statement was irrelevant. Both victims and defendant were white, and nothing in the record suggests the killing of either victim was a racial act.

Defendant also argues that to allow defendant's jury to make its decision to sentence defendant to death based on a statement indicating a racist opinion on the part of defendant undermines the essence of the Eighth Amendment. In *Dawson v. Delaware*, 503 U.S. 159, 117 L. Ed. 2d 309 (1992), the Court overturned a death sentence where, at the sentencing proceeding, evidence was presented that the defendant belonged to a white racist prison gang, the Aryan Brotherhood. The Court held that admission of the Aryan Brotherhood evidence, which had no relevance to the issues being decided in the proceeding, was error. *Id.* at 160, 117 L. Ed. 2d at 314. The Court concluded that this evidence had no tendency to prove any aggravating circumstances or to rebut any mitigating circumstances. *Id.* at 166-67, 117 L. Ed. 2d at 318. The Court recognized, however, that in certain situations the evidence about the Aryan Brotherhood may have been relevant and admissible; it was just not admissible under the particular facts of that case. *Id.* at 166, 117 L. Ed. 2d at 318. Defendant argues that as in *Dawson*, the statement here was irrelevant to any issue in the penalty phase.

In *State v. Bacon*, 337 N.C. 66, 87, 446 S.E.2d 542, 552 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995), the defendant argued that the trial court improperly permitted the district attorney to cross-examine defendant's expert psychiatrist as to whether defendant was dangerous. In *Bacon*, as here, the defendant argued that since this testimony did not prove any aggravating circumstance and did not rebut any mitigating circumstances, admission of the testimony violated his Eighth and Fourteenth Amendment rights. In *Bacon* the expert had testified on direct examination about defendant's mental condition on the day of the crime. *Id.* at 88, 446 S.E.2d at 552. This Court, holding that it was not error for the State to elicit an opinion about defendant's dangerousness during cross-examination of defendant's expert, stated:

North Carolina Rules of Evidence permit broad cross-examination of expert witnesses. N.C.G.S. § 8C-1, Rule 611(b) (1992). The State is permitted to question an expert to obtain further details with regard to his testimony on direct examination, to impeach the witness or attack his credibility, or to elicit new and different evidence relevant to the case as a whole. " 'The largest possible scope should be given,' and 'almost any question' may be put 'to test the value of his testimony.' " 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 42 (3d ed. 1988) (footnotes omitted) (citations omitted).

*State v. Bacon,* 337 N.C. at 88, 446 S.E.2d at 553.

In *State v. Reeves,* 337 N.C. 700, 448 S.E.2d 802 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 860 (1995), this Court held that the trial court did not err when it allowed the district attorney to ask defendant's expert witness during cross-examination about details of other crimes defendant had committed. Specifically, the expert was asked if the defendant had raped three other women and if defendant had also sodomized one of the women and cut her throat. The expert had testified that he had based his opinion concerning defendant's mental problems in part on these other acts of violence which were raised on cross-examination. The trial court in *Reeves,* 337 N.C. at 718, 448 S.E.2d at 809, instructed the jury to consider the evidence about these other crimes only as it formed the basis of Dr. Royal's opinion concerning the mental and emotional condition of the defendant. This Court held the evidence was relevant under Rule 705 since the other crimes were considered by the expert in forming his opinion. *Id.* at 719, 448 S.E.2d at 810.

N.C.G.S. § 8C-1, Rule 705 provides:

The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless an adverse party requests otherwise, in which event the expert will be required to disclose such underlying facts or data on direct examination or *voir dire* before stating the opinion. The expert may in any event be required to disclose the underlying facts or data on cross-examination. There shall be no requirement that expert testimony be in response to a hypothetical question.

We conclude that the statement at issue here was not elicited to establish any type of racial bias but instead to impeach the opinions of Dr. Royal and Dr. Horacek and " 'test the value of [their] testimony.' " *Bacon,* 337 N.C. at 88, 446 S.E.2d at 553 (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 42). Both doctors testified that defendant's actions on the day of the murders were a result of his mental illnesses. On cross-examination Dr. Horacek testified that in forming his opinion about defendant, he "looked at various statements of people who knew David Lynch," including statements from Wes Hodnett. Dr. Royal also stated that he reviewed interviews of defendant's friends and utilized information from the interviews when arriving at his diagnosis. The State then asked Dr. Royal about the statement at issue as well as other statements

made by Wes Hodnett suggesting that defendant planned to kill people sometime before the actual shooting occurred. The trial court instructed the jury that it was only to "consider the alleged statements made by the defendant for the purpose of this witness's forming his opinion based upon those alleged statements and for no other purpose."

As statements made by Wes Hodnett were considered by both experts when they were diagnosing defendant's mental condition, questions about this particular statement were relevant under Rule 705 and admissible under the broad scope permitted during cross-examination of expert witnesses.

Additionally, defendant's friends testified that defendant was gentle, quiet, and kind-natured and had to have been out of his mind when he committed these crimes. This statement was evidence that defendant was not as gentle and kind as defendant's evidence implied. *See Bacon*, 337 N.C. at 88, 446 S.E.2d at 552-53 (holding because defendant had presented evidence through his friends that he was not someone who would kill another human being, that he was even-tempered, and that his actions on the day of the crime were totally out of character, defendant's expert could be asked to give an opinion as to defendant's dangerousness to rebut this evidence). The statement was relevant to show that defendant had, prior to the shooting, manifested dangerousness and a violent attitude toward a particular group of people. This evidence was relevant since in this case defendant shot at a particular group of people, his neighbors.

Defendant also argues that even if the evidence had some probative value, that value was minimal and is outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rule 403 states that

[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

"Whether evidence should be excluded under this [R]ule [403] as being more prejudicial than probative is within the discretion of the superior court judge." *State v. Reeves*, 337 N.C. at 719, 448 S.E.2d at 810. "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. at 285,

372 S.E.2d at 527. The expert witnesses in this case stated that they considered statements made by defendant's friends in forming their opinions as to defendant's mental condition. The statement at issue was relevant to the jury's consideration of the expert's opinion, and the trial court's ruling was not so arbitrary that it could not have been the result of a reasoned decision. We conclude that the trial court did not abuse its discretion in allowing the admission of the statement and overrule defendant's assignment of error.

**[13]** Defendant argues that the trial court committed reversible error in submitting the aggravating circumstance that the murder of India Anderson was especially heinous, atrocious, or cruel as it was not supported by the evidence and its submission offended federal and state constitutional principles.

Defendant begins his argument by stating that the North Carolina pattern jury instruction for the especially heinous, atrocious, or cruel circumstance is unconstitutionally vague. He notes that the North Carolina instruction was determined to be unconstitutional in *Smith v. Dixon*, 766 F. Supp. 1370 (E.D.N.C. 1991), *rev'd,* 14 F.3d 956 (4th Cir.), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 72 (1994). However, in citing *Smith v. Dixon,* defendant fails to note that the instruction attacked in *Dixon* defined especially heinous, atrocious, or cruel without limiting the words which focused the jury with specificity to the nature of the circumstance. *Id.* at 1383.

In this case the trial court included a limiting instruction when instructing the jury as to the especially heinous, atrocious, or cruel circumstance. After defining heinous, atrocious, or cruel, the trial court specifically instructed that

> it is not enough that this murder be heinous, atrocious or cruel as those terms have just been defined. This murder must have been especially heinous, atrocious, or cruel; and not every murder is especially so.
>
> For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have excluded [sic] that which is normally present in any killing; or this murder must have been a conscienceless or pitiless crime which was unnecessarily torturous to the victim.

This Court has consistently held that the especially heinous, atrocious, or cruel aggravating circumstance is constitutional when the narrowing definition is incorporated into the instruction. *State v. Lee,*

335 N.C. 244, 285, 439 S.E.2d 547, 569, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 162, *reh'g denied,* —— U.S. ——, 130 L. Ed. 2d 532 (1994); *State v. Gibbs,* 335 N.C. 1, 70, 436 S.E.2d 321, 361 (1993), *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 881 (1994); *State v. Syriani,* 333 N.C. 350, 391-92, 428 S.E.2d 118, 141, *cert. denied,* —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied,* —— U.S. ——, 126 L. Ed. 2d 707 (1994). Defendant has presented no new argument that convinces us we should overrule our prior decisions on this issue.

**[14]** Defendant also argues that it was error to submit the especially heinous, atrocious, or cruel aggravating circumstance because there was insufficient evidence to support its submission.

> In determining sufficiency of the evidence to support this [aggravating] circumstance, the trial court must consider the evidence in the light most favorable to the State. The State is entitled to every reasonable inference to be drawn from the facts. Contradictions and discrepancies are for the jury to resolve, and all evidence admitted which is favorable to the State is to be considered.

*State v. Gibbs,* 335 N.C. at 61, 436 S.E.2d at 355-56 (citations omitted). This Court has identified several types of murders which may warrant the submission of the especially heinous, atrocious, or cruel circumstance.

> One type includes killings physically agonizing or otherwise dehumanizing to the victim. *State v. Lloyd,* 321 N.C. 301, 319, 364 S.E.2d 316, 328 [*death sentence vacated,* 488 U.S. 807, 102 L. Ed. 2d 18, *on remand,* 323 N.C. 622, 374 S.E.2d 277] (1988) [, *death sentence vacated,* 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand,* 329 N.C. 662, 407 S.E.2d 218 (1991)]. A second type includes killings less violent but "conscienceless, pitiless, or unnecessarily torturous to the victim," *State v. Brown,* 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985), [*cert. denied,* 476 U.S. 1164, 90 L. Ed. 2d 733 (1986),] including those which leave the victim in her "last moments aware of but helpless to prevent impending death," *State v. Hamlet,* 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). A third type exists where "the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder." *Brown,* 315 N.C. at 65, 337 S.E.2d at 827.

*Id.* at 61-62, 436 S.E.2d at 356.

In the instant case, viewed in the light most favorable to the State, the evidence supports the submission of the especially heinous, atrocious, or cruel circumstance. The victim was shot by defendant nine times. The evidence indicates that India was hit once and began jumping on one leg and wandering across the street into the Hunters' yard. One witness testified that after the victim was first shot and wandering in the street, she then

> looked toward us; and when we said "Get down," she got down and started crawling toward us. Then I seen like another shot, like it would bounce, like her clothes like bounced up; and then she would try to get up and try to walk toward us again; and then we kept hollering, "Get down;" and she would try to get down; but she would again try to get back up and walk; and it just went on for a few minutes like that; and finally, she came to our ditch in our yard the last time; and I seen her get shot in the side; and it looked like it blowed her side out and she fell to the ground.

This testimony demonstrates that the killing would have been "physically agonizing" to the victim and that the killing was " 'conscienceless, pitiless, or unnecessarily torturous.' " *Gibbs*, 335 N.C. at 61, 436 S.E.2d at 356 (quoting *Brown*, 315 N.C. at 65, 337 S.E.2d at 826-27). Defendant manifested unusual depravity of mind in this case, repeatedly and continuously shooting the victim, even as she attempted to crawl to safety. While certain testimony suggested that the first or second shot that struck India was the shot to the head and that death would have occurred soon after India was shot in the head, other evidence indicated that the victim lived for some time after being shot more than once and that in the last moments before her death, the victim was aware that she was going to die but was unable to prevent her impending death. The evidence viewed in the light most favorable to the State supported the submission of the especially heinous, atrocious, or cruel circumstance. Defendant's assignment of error is overruled.

[15] Defendant argues that the trial court erred in instructing the jury that it could refuse to find uncontroverted nonstatutory mitigating circumstances if the jury deemed the evidence to have no mitigating value. Defendant argues that a sentencer in a capital case "may not refuse to consider . . . any relevant mitigating evidence," *Hitchcock v. Dugger*, 481 U.S. 393, 394, 95 L. Ed. 2d 347, 350 (1987), and that by instructing the jury to consider if a submitted nonstatutory mitigating

circumstance has mitigating value, the trial court allowed the jury to disregard relevant mitigating evidence. Defendant argues that all forty-one mitigating circumstances submitted to the jury were inherently mitigating and that the jury should not have been allowed to reject any of the mitigating circumstances. Defendant argues the jury should have been required to consider and give effect to all the circumstances supported by uncontroverted evidence when imposing sentence because the jury "may not refuse to consider[] any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death." *Penry v. Lynaugh*, 492 U.S. 302, 318, 106 L. Ed. 2d 256, 277 (1989). Defendant argues that once a peremptory instruction is given as to a mitigating circumstance, the only question that remains is how much weight the jury will give the circumstance. Defendant argues that contrary to the jury instructions given in this case, the jury cannot decide a nonstatutory mitigating circumstance has no weight after being given a peremptory instruction which states that all of the evidence tends to show the existence of the mitigating circumstance.

Defendant concedes that this Court has previously rejected this argument but asks the Court to reconsider and reverse its prior decisions in this regard. We conclude that the trial court's peremptory instructions for nonstatutory mitigating circumstances, which instructed the jury that all the evidence tended to show the particular mitigating circumstance but the jury must determine if the circumstance existed and had value, were correct. In *State v. Green*, 336 N.C. 142, 443 S.E.2d 14, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994), the defendant argued that the trial court erred in not instructing the jury to consider and give weight to an uncontroverted nonstatutory mitigating circumstance. The Court held that a juror may find that a nonstatutory mitigating circumstance exists but may give that circumstance no mitigating value. The Court noted that in *State v. Gay*, 334 N.C. 467, 434 S.E.2d 840 (1993), the Court held that peremptory instructions could be given for nonstatutory mitigating circumstances. *Green*, 336 N.C. at 173, 443 S.E.2d at 32. This Court in *Green* went on to note that "nothing we stated in *Gay* supports the notion that the peremptory instructions to be used with regard to nonstatutory mitigating circumstances should be identical to those used with regard to statutory mitigating circumstances." *Id.* The Court held that even if a jury finds from uncontroverted and manifestly credible evidence that a nonstatutory mitigating circumstance exists, " 'jurors may reject the nonstatutory mitigating circumstance

if they do not deem it to have mitigating value.' " *Id.* at 173-74, 443 S.E.2d at 32-33 (quoting *Gay*, 334 N.C. at 492, 434 S.E.2d at 854).

Defendant in essence argues that the jury should have been instructed to consider and give weight to uncontroverted nonstatutory mitigating circumstances. We conclude that the trial court's peremptory instructions for nonstatutory mitigating circumstances were correct. The trial court first set out a mitigating circumstance and then would instruct:

> All of the evidence tends to show [named mitigating circumstance]. Accordingly, as to this mitigating circumstance, I charge that if you find the facts to be as all the evidence tends to show, you will answer, "Yes," as to the mitigating circumstance Number [#] on the issue and recommendation form if one or more of you deems it to have mitigating value.

"[J]urors are allowed to reject any nonstatutory mitigating circumstance which they do not deem to have mitigating value." *State v. Basden*, 339 N.C. at 304, 451 S.E.2d at 247; *see also State v. Spruill*, 338 N.C. 612, 661, 452 S.E.2d 279, 306 (1994), *cert. denied,* —— U. S. ——, —— L. Ed. 2d ——, 64 U.S.L.W. 3242 (1995); *State v. Reeves*, 337 N.C. at 737, 448 S.E.2d at 820; *State v. Robinson*, 336 N.C. 78, 117, 443 S.E.2d 306, 325. Defendant's argument is contrary to our prior decisions on this issue, and defendant has demonstrated no reason why we should reverse or alter our recent precedent. This assignment of error is without merit and overruled.

[16]    Defendant argues that the trial court committed plain and reversible error when it failed to peremptorily instruct the jury as to statutory mitigating circumstances—N.C.G.S. § 15A-2000(f)(2), murder committed while the defendant was under the influence of a mental or emotional disturbance, and N.C.G.S. § 15A-2000 (f)(6), the impairment of defendant's capacity to appreciate the criminality of his conduct—and the nonstatutory mitigating circumstance that defendant was generally depressed. Defendant argues that he offered manifestly credible and uncontradicted evidence as to each of these three mitigating circumstances and that he was overwhelmingly prejudiced by the trial court's failure to peremptorily instruct the jury on these three circumstances.

"Where all the evidence in a case, if believed, tends to show that a particular mitigating factor exists, a peremptory instruction is proper. However, a peremptory instruction is inappropriate when the

evidence surrounding that issue is conflicting." *State v. Noland,* 312 N.C. 1, 20, 320 S.E.2d 642, 654 (1984), *cert. denied,* 469 U.S. 1230, 84 L. Ed. 2d 369, *reh'g denied,* 471 U.S. 1050, 85 L. Ed. 2d 342 (1985). In this case the trial court considered whether a peremptory instruction should be given for each of the submitted mitigating circumstances and determined that the evidence did not support giving a peremptory instruction as to these three particular circumstances. We agree.

The State presented the expert psychiatric testimony of Dr. Lynn. Lynn testified that he examined defendant and reviewed tests done on defendant. His examination found no evidence of any major psychiatric problems or severe mental illness. Lynn testified that defendant was in contact with reality when he examined defendant and that he did not find any type of mental illness indicating defendant did not know right from wrong and could not be responsible.

An employer of defendant's also testified that defendant knew right from wrong and that the employer was never aware of or had any reason to believe defendant suffered from any kind of mental condition. Another workplace acquaintance testified that defendant did not seem "mentally ill at all" and that he knew exactly what he was doing on 9 December 1991. Detective Finger and Detective Phillips, who were with defendant on 9 December 1991, testified that based on their observations of defendant on 9 December 1991, defendant understood the nature and qualities of his actions and could tell right from wrong on the day of the murders. This evidence indicates that defendant was not under the influence of a mental or emotional disturbance when the murders were committed and that his capacity to appreciate the criminality of his conduct was not impaired.

Additional testimony indicated defendant was able to appreciate the criminality of his conduct or to conform his conduct to the requirements of law and was not generally depressed. Witnesses testified that defendant was talkative, went on trips with people, was trusted with his friends' children and grandchildren, volunteered to help at children's church summer camp, was a good worker, and was very "gentle, kind and always wanting to help anyway that he could." There was also testimony defendant enjoyed being at summer camp, loved children, was relaxed when he visited friends, had a "very quick sense of humor," was very personable once he got to know people, and enjoyed talking with people.

We conclude the evidence was conflicting as to whether defendant was under the influence of a mental or emotional disturbance when he committed the murders, whether defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, and whether defendant was generally depressed. The trial court did not err by failing to give a peremptory instruction as to these mitigating circumstances. Defendant's assignment of error is overruled.

PRESERVATION ISSUES

[17-26] Defendant has designated ten preservation issues. The issues are as follows: (i) the trial court committed reversible error in failing to provide the jury with written jury instructions; (ii) the trial court committed reversible error in overruling defendant's objections and denying his motion to preclude the use of aggravating circumstance N.C.G.S. § 15A-2000(e)(10); (iii) the trial court erred in overruling defendant's objection and denying his motion to preclude the use of aggravating circumstance N.C.G.S. § 15A-2000(e)(11); (iv) the trial court erred by allowing death-qualification of the jury and by denying defendant's motion for individual *voir dire* for a portion of the jury *voir dire*; (v) the trial court erred by permitting the prosecutor to use peremptory challenges to excuse qualified jurors on account of their lack of enthusiasm for or opposition to the death penalty; (vi) the trial court erred in failing to require the prosecution to make pretrial disclosure of the aggravating circumstances on which the State intended to rely and any evidence tending to negate or establish such factors; (vii) the trial court erred by instructing the jury that defendant bore the burden of proving mitigating circumstances to the satisfaction of the jury; (viii) the trial court's instruction that allowed the jury to consider the death penalty if the aggravating and mitigating circumstances were in equipoise was erroneous; (ix) the North Carolina death penalty statute is unconstitutional; and (x) the trial court erred when it instructed the jury that it had a duty to return a recommendation of death if it found the aggravating circumstances, in light of the mitigating circumstances, were sufficiently substantial to call for the death penalty. We have considered defendant's arguments with regard to these issues and have found no compelling reasons to depart from our prior holdings which are dispositive. *See State v. Ward*, 338 N.C. 64, 122, 449 S.E.2d 709, 742 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 1013 (1995).

[27-31] Defendant also presents five other issues under preservation issues, namely, (i) the trial court erred in denying defendant's motion

to suppress defendant's pretrial statement to the police; (ii) the trial court erred in denying defendant's motion to dismiss all charges against him; (iii) the trial court erred when it sustained the prosecution's objections to defense questions on *voir dire* regarding the jurors' understanding of specific mitigating circumstances and mitigating circumstances in general; (iv) the trial court committed reversible error in excusing several jurors for cause based on their answers regarding their ability to consider capital punishment; and (v) the trial court erred in failing to define for the jury the term preponderance of the evidence as that term relates to defendant's burden to prove mitigating circumstances.

We note first that these issues are not proper preservation issues as they are not determined solely by principles of law upon which this Court has previously ruled, but require a review of the transcript and record to determine whether based on the specific facts, question, or answer, the assignment of error has merit. Where counsel determines that an issue of this nature has no merit, counsel should, "omit it entirely from his or her argument on appeal." *State v. Barton*, 335 N.C. 696, 712, 441 S.E.2d 295, 303 (1994). Nevertheless, we have considered defendant's arguments on these issues, have thoroughly reviewed the transcript and record as to these assignments, and have found no error. These assignments of error are, therefore, without merit.

PROPORTIONALITY

[32] Having found defendant's trial and capital sentencing proceeding to be free from prejudicial error, we are required by statute to review the record and determine for each murder: (i) whether the record supports the jury's finding of the aggravating circumstances upon which the court based its sentence of death; (ii) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (Supp. 1994); *State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895, *reh'g denied*, —— U.S. ——, 129 L. Ed. 2d 924 (1994).

In the murder of India Anderson, the jury found three aggravating circumstances: (i) that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); (ii) that the defendant knowingly created a great risk of death to more than one person by means of a

weapon which would normally be hazardous to the lives of more than one person, N.C.G.S. § 15A-2000(e)(10); and (iii) that the murder was a part of a course of conduct in which defendant engaged which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

In the murder of Bobby Anderson, the jury found only one aggravating circumstance, that the murder was a part of a course of conduct in which defendant engaged which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

After a thorough review of the transcript, record on appeal, briefs, and oral arguments of counsel, we conclude that the evidence supported the jury's finding that each of these aggravating circumstances existed. We also conclude, based on this review, that nothing in the record suggests that the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally, we consider whether the imposition of the death penalty in this case is proportionate to other cases in which we have affirmed the death penalty, considering both the crime and the defendant. *State v. Robinson*, 336 N.C. at 132-33, 443 S.E.2d at 334. The purpose of conducting proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also serves "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980).

To begin, we compare this case with similar cases within a pool consisting of

> *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78

L. Ed. 2d 704 (1983). Only cases found to be free from error in both the guilt-innocence and sentencing phases are considered in conducting this review. *State v. Goodman,* 298 N.C. 1, 35, 257 S.E.2d 569, 591 (1979).

In *State v. Bacon,* 337 N.C. 66, 446 S.E.2d 542, this Court clarified the composition of the pool so that it accounts for post-conviction relief awarded to death-sentenced defendants.

> Because the "proportionality pool" is limited to cases involving first-degree murder convictions, a post-conviction proceeding which holds that the State may not prosecute the defendant for first-degree murder or results in a retrial at which the defendant is acquitted or found guilty of a lesser included offense results in the removal of that case from the "pool." When a post-conviction proceeding results in a new capital trial or sentencing proceeding, which, in turn, results in a life sentence for a "death-eligible" defendant, the case is treated as a "life" case for purposes of proportionality review. The case of a defendant sentenced to life imprisonment at a resentencing proceeding ordered in a post-conviction proceeding is similarly treated. Finally, the case of a defendant who is either convicted of first-degree murder and sentenced to death at a new trial or sentenced to death in a resentencing proceeding ordered in a post-conviction proceeding, which sentence is subsequently affirmed by this Court, is treated as a "death affirmed" case.

*Id.* at 107, 446 S.E.2d at 564.

Our consideration on proportionality review is limited to cases roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *State v. Syriani,* 333 N.C. at 400, 428 S.E.2d at 146.

We begin our analysis by comparing the instant case with the seven cases in which this Court has determined that the sentence of death was disproportionate: *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

In only two of the cases where this Court has held the sentences disproportionate, *State v. Rogers* and *State v. Bondurant,* did the jury find the course of conduct aggravating circumstance. We conclude that this case is distinguishable from both *Bondurant* and *Rogers.*

In *State v. Rogers* the defendant shot and killed one victim during an argument in a parking lot. *Rogers,* 316 N.C. at 210, 341 S.E.2d at 718. In *Rogers,* as in the case of Bobby Anderson, the only aggravating circumstance found was the course of conduct circumstance. However, in *Rogers* the event upon which the aggravating circumstance was based was the firing of a pistol at the victim's companion in the moments immediately following the shooting of the victim. *Id.* at 234, 341 S.E.2d at 731. These facts stand in stark contrast to the numerous and serious accompanying crimes of violence in the present case. Defendant's additional violent crimes in the consideration of the sentence for the murder of Bobby Anderson included the murder of a twelve-year-old child; seriously injuring two additional victims; shooting three police officers; and shooting into his neighbors' residences, some of which were occupied at the time. The facts of this case are easily distinguishable from *Rogers.*

In *State v. Bondurant* the defendant shot his victim after the defendant had spent the night drinking. Immediately after the victim had been shot, the defendant took the victim to the hospital. *Bondurant,* 309 N.C. at 694, 309 S.E.2d at 182-83. The Court held that the death sentence was disproportionate in *Bondurant* in part because "immediately after he shot the victim, [defendant] exhibited a concern for [the victim's] life and remorse for his action by directing the driver of the automobile to the hospital." *Id.* at 694, 309 S.E.2d at 182. In this case defendant expressed no remorse for his action, continuing to shoot at the victims after they had fallen. Unlike the defendant in *Bondurant,* who took the victim to a hospital, defendant here ensured that no one could help the victims by shooting those who tried. *Bondurant* does not support a finding that the sentences in this case are disproportionate.

Further, we find no significant similarity between this case and any of the five other cases in which the Court has held that the death penalty is disproportionate. Most notably, in all the cases where the death sentence has been determined to be disproportionate, only one person has been murdered by the defendant. In contrast, this case involved a double murder and multiple serious assaults.

Defendant argues that the death sentences in this case are disproportionate given the multitude of mitigating circumstances found by the jury. We note that in deciding whether a death sentence is disproportionate, this Court independently considers each individual defendant and the nature of the crimes that defendant has committed. *State v. Bacon*, 337 N.C. at 109-10, 446 S.E.2d at 566.

This Court has

consistently . . . rejected a "mechanical[,] mathematical approach" to weighing aggravating and mitigating circumstances. *State v. McDougall*, 308 N.C. [1,] 32, 301 S.E.2d [308,] 326[, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983)]. We cannot say as a matter of law that the jury recommended a disproportionate sentence merely because the sentence was based on a single aggravating circumstance.

*State v. Greene*, 324 N.C. 1, 27, 376 S.E.2d 430, 446 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 329 N.C. 771, 408 S.E.2d 185 (1991).

A "single aggravating circumstance may outweigh a number of mitigating circumstances and may be sufficient to support a death sentence." *State v. Bacon*, 337 N.C. at 110, 446 S.E.2d at 566. In this case the trial court submitted forty-one mitigating circumstances, and the jury found thirty-eight of them. While the number of mitigating circumstances submitted in this case is great, only three of the submitted circumstances were statutory, and the jury found only two of them: (i) that defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1), and (ii) that the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2). The jury failed to find N.C.G.S. § 15A-2000(f)(6), that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

Additionally, many of the nonstatutory mitigating circumstances which were submitted were directed at three particular aspects of defendant's character. First, the court submitted the nonstatutory mitigating circumstance that "defendant has engaged in work providing direct assistance and helped others." The court also submitted six separate mitigating circumstances which discussed specific instances when the defendant helped others. Second, six of defendant's nonstatutory mitigating circumstances related to his activities at church.

Third, ten of the mitigating circumstances related to defendant's mental problems.

As to the murder of Bobby Anderson, only one aggravating circumstance was submitted and found, the course of conduct circumstance. This Court has upheld death sentences in other cases where this was the only aggravating circumstance and there were multiple mitigating circumstances. *See State v. McHone,* 334 N.C. 627, 435 S.E.2d 296 (1993) (holding that in a double murder where the jury found ten mitigating circumstances, including that defendant was mentally or emotionally disturbed when he committed the crime, but rejected the circumstance that defendant's capacity to appreciate the criminality of his acts was impaired, death sentence was not disproportionate), *cert. denied,* —— U.S. ——, 128 L. Ed. 2d 220 (1994); *State v. Williams,* 305 N.C. 656, 292 S.E.2d 243 (1982) (holding that in a double murder where jury found seven mitigating circumstances including that defendant had no significant history of prior criminal activity and had a good character and reputation, death sentence was not disproportionate), *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied,* 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983).

As to the murder of India Anderson, three aggravating circumstances were submitted: (i) course of conduct; (ii) especially heinous, atrocious, or cruel; and (iii) knowing risk to more than one person by the use of a weapon or device hazardous to the lives of more than one person. As noted above, the Court has upheld a death sentence when only the course of conduct aggravating circumstance has been found by the jury. This Court has also upheld death sentences when the only circumstance found was especially heinous, atrocious, or cruel even when there was evidence that defendant suffered from a mental or emotional disorder. *See State v. Syriani,* 333 N.C. 350, 428 S.E.2d 118; *State v. Huffstetler,* 312 N.C. 92, 322 S.E.2d 110 (1984), *cert. denied,* 471 U.S. 1009, 85 L. Ed. 2d 169 (1985); *State v. Martin,* 303 N.C. 246, 278 S.E.2d 214, *cert. denied,* 454 U.S. 933, 70 L. Ed. 2d 240, *reh'g denied,* 454 U.S. 1117, 70 L. Ed. 2d 655 (1981).

We conclude that based on the particular aggravating circumstance or circumstances found by the jury during the sentencing proceeding, the death sentences in this case are not rendered disproportionate merely by the number of mitigating circumstances also found.

Defendant also argues that the death sentences were disproportionate because many juries have returned verdicts of life imprison-

ment even in double- or triple-murder cases. Defendant cites many cases in his brief to support this argument. We note that some of the cases included by defendant in his analysis are not in the proportionality pool as the crimes in those cases were committed prior to 1 June 1977, the effective date of our capital punishment statute. *State v. Dampier*, 314 N.C. 292, 333 S.E.2d 230 (1985); *State v. Mills*, 307 N.C. 504, 299 S.E.2d 203 (1983); *State v. Harris*, 306 N.C. 724, 295 S.E.2d 391 (1982); *State v. Stephens*, 300 N.C. 321, 266 S.E.2d 588 (1980). Our review of multiple-murder cases where the defendant was sentenced to life imprisonment reveals that the case that is most similar to the case at hand is *State v. Rainey*, 331 N.C. 259, 415 S.E.2d 337 (1992). In *Rainey* the defendant murdered three people at a funeral; he also shot and seriously injured three others. The jury found that the murder was part of a course of conduct including other violent crimes, that the defendant had no significant history of prior criminal activity, that the murder was committed while defendant was mentally or emotionally disturbed, and that defendant's capacity to appreciate the criminality of his conduct was impaired. Nevertheless, we conclude that *Rainey* is distinguishable from the present case in that (i) the jury in *Rainey* did not reject the impaired capacity mitigating circumstance and (ii) defendant Rainey left the scene immediately after the shooting and called 911. *Id.* at 263, 415 S.E.2d at 339.

This Court has held that the fact that a defendant is a multiple murderer stands as a "heavy" factor against defendant when determining the proportionality of a death sentence. *State v. McHone*, 334 N.C. at 648, 435 S.E.2d at 308; *State v. Robbins*, 319 N.C. 465, 529, 356 S.E.2d 279, 316, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987). Furthermore,

the factors to be considered and their relevance during proportionality review in a given capital case "will be as numerous and as varied as the cases coming before us on appeal." *Williams*, 308 N.C. at 80, 301 S.E.2d at 355. Therefore, the fact that in one or more cases factually similar to the one under review a jury or juries have recommended life imprisonment is not determinative, standing alone, on the issue of whether the death penalty is disproportionate in the case under review. Early in the process of developing our methods for proportionality review, we indicated that similarity of cases, no matter how many factors are compared, will not be allowed to "become the last word on the subject of proportionality rather than serving as an initial point of inquiry." *Id.* at 80-81, 301 S.E.2d at 356. Instead, we stated plainly

that the constitutional requirement of "individualized consideration" as to proportionality could only be served if the issue of whether the death penalty was disproportionate in a particular case ultimately rested upon the "experienced judgments" of the members of this Court, rather than upon mere numerical comparisons of aggravators, mitigators and other circumstances.

*State v. Green*, 336 N.C. at 198, 443 S.E.2d at 46-47.

In other double-murder cases, juries have returned sentences of death; and this Court has held these sentences were not disproportionate even though there was evidence that defendant was suffering from a mental or emotional disturbance or was unable to appreciate the criminality of his activity. *See State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252 (holding that death sentence was not disproportionate even though jury found mitigating circumstances that defendant was under influence of mental and emotional disturbance and that defendant's capacity to appreciate the criminality of his conduct was impaired); *State v. Green*, 336 N.C. 142, 443 S.E.2d 14 (holding that death sentence was not disproportionate even though jury found murder committed while defendant under the influence of mental or emotional disturbance); *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (holding that death sentence was not disproportionate even though jury found that defendant was under influence of mental or emotional disturbance, had borderline IQ, and suffered from an adjustment disorder and a personality disorder); *State v. McHone*, 334 N.C. 627, 435 S.E.2d 296 (holding that death sentence was not disproportionate even though jury found murder committed while defendant was under the influence of mental and emotional disturbance).

In *State v. Ingle*, 336 N.C. 617, 445 S.E.2d 880, the defendant brutally murdered an elderly couple for no apparent reason. Defendant presented evidence to show that at the time of the murders, he was experiencing a psychotic episode that was the result of a borderline personality disorder. *Id.* at 627, 445 S.E.2d at 885. For one of the murders the only aggravating circumstance found by the jury was the course of conduct circumstance; for the other murder the jury found the especially heinous, atrocious, or cruel circumstance and the course of conduct circumstance. *Id.* at 652, 445 S.E.2d at 898. The trial court submitted, but the jury did not find, the mitigating circumstance that defendant lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the law. *Id.* at 655, 445

S.E.2d at 900. The jury also rejected the circumstances that defendant had no significant history of violence and that the murder was committed while defendant was under the influence of a mental or emotional disturbance. *Id.* Defendant argued that the death sentences were disproportionate based in part on the substantial evidence of his insanity at the time of the murders. This Court rejected defendant's argument and held that the sentence of death for each murder was not disproportionate.

We conclude that the actions of defendant in this case were more egregious than the actions of defendant in *Ingle* and in most multiple-murder cases. Defendant argues that in most of the death cases affirmed on appeal, the defendants exhibited far more depravity of mind and inhumane cruelty than defendant did in this case; we disagree. Defendant in this case planned to shoot and murder his neighbors. Defendant barricaded himself in his home and protected himself from retaliation by putting mattresses against the walls and blocking his doors. He then waited for the Andersons to leave. When Tammy Anderson, India Anderson, and Heather Shumate left for school, defendant shot and hit twelve-year-old India and her mother. As India wandered across the street, defendant shot at her again and continued to shoot at her even as she attempted to crawl towards safety, striking India's body many times. When Ronald Hunter, Jr. attempted to aid India Anderson, defendant shot him.

Defendant also repeatedly shot at Bobby Anderson. After Bobby fell to the floor of his home, defendant continued to shoot at the home so that Bobby's wife could not reach Bobby and help him. Defendant also ensured that no police could assist the victims by shooting at the police. At the end of defendant's four-hour rampage, two victims were dead; two victims were seriously injured; three victims had been struck by at least one shot; and bullets had entered occupied homes in the neighborhood. The jury found that defendant was not insane and that his capacity to appreciate the criminality of his conduct was not impaired.

Contrary to defendant's arguments, we conclude that the murders in this case indicated depravity of mind and inhumane cruelty; the murders were brutal, pitiless, and conscienceless. The actions by defendant were as egregious or more egregious than those of other double-murder defendants who have argued that they were mentally impaired. *See State v. Skipper,* 337 N.C. 1, 446 S.E.2d 252; *State v. Ingle,* 336 N.C. 617, 445 S.E.2d 880; *State v. Robinson,* 336 N.C. 78, 443

S.E.2d 306. In light of the facts and circumstances of this case, we conclude that the sentences of death in this case were not disproportionate.

In conclusion, we have carefully reviewed the transcript of the trial and sentencing proceeding as well as the record, briefs, and oral arguments of counsel. We have considered all of defendant's assignments of error and conclude that defendant received a fair trial and a fair sentencing proceeding free from prejudicial error before an impartial judge and jury. We conclude that the convictions and aggravating circumstance were fully supported by the evidence and that the sentences of death were not imposed under the influence of passion, prejudice, or any other arbitrary factor and are not disproportionate.

NO ERROR.